STATE OF INDIANA )
) SS:
COUNTY OF HAMILTON )

IN THE HAMILTON SUPERIOR COURT

CAUSE NO.

29D01-1003 CT 310

PAUL CATLIN, )
)
Plaintiff, )
)
v. )
)
BIOPRO TECHNOLOGY, GIA WELLNESS, )
ALFRED HANSER, RAY W. GRIMM, JR., )
LYNDA CORMIER, GARY MERRITT, )
GLOBAL QUANTECH, INC., )
IGOR SMIRNOV and )
DIRECT EDGE MEDIA, INC., )
)
Defendants. )

## CLASS ACTION COMPLAINT

Plaintiff, Paul Catlin, for himself and all others similarly situated, by counsel, for the cause of action against the Defendants, allege and state as follows:

### NATURE OF ACTION

1.    Plaintiff brings this action on behalf of himself and a class of similarly situated people (the "Class") to recover the millions of dollars paid to Defendants as a result of Defendants' unlawful scheme to market and sell products purported to protect humans from the dangers of harmful electromagnetic radiation ("EMR") through the use of noise field nano-technology, but which actually offer no such protection. These products include, but are not limited to, the BIOPRO Cell Chip ("Cell Chip") and the BIOPRO Universal Chip ("Universal Chip"), both of which are manufactured by BioPro Technology ("BioPro") and purport to use noise field nano-technology to offer the promised protection.



EXHIBIT
A

2.    Plaintiff and members of the Class have been injured by the payment of money to Defendants BioPro and/or Gia Wellness for a product that cannot work as advertised and are entitled to restitution of the payments that they made to BioPro and/or Gia Wellness and disgorgement of the Defendants' wrongfully gotten gains.

## PARTIES

3.    Plaintiff Paul Catlin is a citizen and resident of the State of Indiana and owns a home at 19601 Horton Road, Westfield, Hamilton County, Indiana.

4.    Defendant BioPro is a business with its primary place of business in the State of California. BioPro is in the business of manufacturing, selling, and distributing products that combat "electropollution," including products purporting to use noise field nano-technology.

5.    Defendant Gia Wellness is a business with its primary place of business in the State of California. Gia Wellness is in the business of manufacturing, selling, and distributing products that combat "electropollution," including products purporting to use noise field nano-technology.

6.    BioPro has re-branded itself as Gia Wellness.

7.    Defendant Alfred Hanser is a resident of the State of California and is CEO and a Co-Founder of both BioPro and Gia Wellness.

8.    Defendant Ray W. Grimm, Jr. is a resident of the State of California and is a Co-Founder of BioPro.

9.    Defendant Lynda Cormier is a resident of the State of California, is Vice-President of Sales of BioPro, and is President and Co-Founder of Gia Wellness.

10.    Defendant Gary Merritt is a resident of California and is Vice-President of Operations of both BioPro and Gia Wellness.

2

11.     Defendant Global QuanTech, Inc. ("Global QuanTech") is a California corporation with its principal place of business in the State of California. Global QuanTech is in the business of licensing and distributing products using a patented noise field nano-technology.

12.     Defendant Igor Smirnov is a resident of the State of California, is the founder of Global QuanTech, and directs Global QuanTech's activities.

13.     Defendant Direct Edge Media, Inc. is a California corporation with its principal place of business in the State of California. Direct Edge Media is in the business of printing documents for direct marketing companies.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action as the Plaintiff seeks remedy for consumer fraud; violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; and unjust enrichment based on the purchase of products sold by BioPro and Gia Wellness purporting to contain MRET technology in the State of Indiana for personal use in the State of Indiana.

15.     Jurisdiction may be exercised against Defendants because Defendants do business and seek sales of consumer products in the State of Indiana.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     MRET Technology & BioPro's Products.

16.     Igor Smirnov invented a noise field nano-technology, known as Molecular Resonance Effect Technology ("MRET"), and patented this technology as United States Patent Number 6,369,399.[1]

---

[1] Exhibit A, United States Patent Number 6,369,399.

17.     MRET is a technology that consists of a polymer containing an oxydated hydrocarbon emulsifier, a galvanic salt, a parasympatholytic agent, a dye or stain, and a polysaccharide.[2] The patent for this technology states that when this material is exposed to EMR, it will respond "thereto by emission of electromagnetic oscillations at frequencies which counter the adverse effects of the incident electromagnetic radiation on the body."[3]

18.     Igor Smirnov founded and operates Global QuanTech in order to license the use of MRET technology to companies who seek to manufacture, market, and sell products purporting to contain MRET technology.

19.     Global QuanTech describes the method in which MRET works as "superimposing an optimal random field or 'noise field'" on man-made sources of EMR, "thus making the resulting field random and the exposure neutral on a biological level … without disturbing the functions and operations of your cell phone." According to Global QuanTech, the MRET polymer "emits subtle low frequencies electromagnetic oscillations (the 'noise field') that resemble resonance frequencies of living cells in the body" when in the presence of an external electromagnetic field. Global QuanTech states that the MRET polymer emits this noise field passively, without any power source.

20.     Global QuanTech, under the direction of Igor Smirnov, has licensed use of the MRET technology invented by Igor Smirnov to BioPro and Gia Wellness for distributing products containing MRET technology in the United States.

21.     Global QuanTech is accepting proposals for distribution of products containing MRET technology outside of the United States.

---

[2] *Id.*

[3] *Id.*

4

22.     Upon information and belief, BioPro and Gia Wellness are the only companies licensed to distribute products containing MRET technology in the United States.

23.     BioPro and Gia Wellness manufacture, distribute, and sell products that purportedly use the MRET technology invented by Igor Smirnov. These products include, but are not limited to, the BIOPRO Cell Chip and the BIOPRO Universal Chip, both of which are manufactured, distributed, and sold by BioPro and purport to use MRET technology to offer the promised protection.

24.     The Cell Chip is a product manufactured and marketed by BioPro and is a device consisting of a hard, black plastic shell in which the MRET polymer is contained. The Cell Chip is designed to be adhered to an electronic device, such as a cell phone, personal digital assistant, or Bluetooth headset. Gia Wellness manufactures, distributes, and sells a similar device called the Cell Guard.

25.     The Universal Chip is a product manufactured and marketed by BioPro and is a device consisting of a hard, black plastic shell in which the MRET polymer is contained. The Universal Chip is designed to be applied to many electrical home appliances. Gia Wellness manufactures, distributes, and sells a similar device called the Universal Guard.

26.     BioPro and Gia wellness have written and distribute an instruction booklet that provides guidelines for uses of the Universal Chip/Guard. Those guidelines state that some electronic devices, such as toasters and laptop computers need only one Universal Chip/Guard, while others, such as cordless phones, vacuum cleaners, and automobiles, need two chips. This instruction booklet states that some electronic devices "may need … three or more [Universal Chips/Guards] depending on the nature of the device."

5

B.    **The Scientific Evidence Supporting the Claims of MRET's Efficacy and Method of Operation.**

27.    Global QuanTech, BioPro, and Gia Wellness all state that MRET is a passive noise field technology that is beneficial to human health.

28.    Gia Wellness markets MRET technology as part of a proprietary "GiaPlex" dual action technology.

29.    Gia Wellness claims that the term "GiaPlex" is trademarked, but that trademark has not been registered with the United States Patent and Trademark Office.

30.    Noise field technology uses EMR waves to mask the effect of other EMR waves on some types of cells.

31.    Scientific studies have shown that the noise field effect works when the interfering EMR wave is randomly varied in the 50Hz to 120Hz range and contains a signal that is around seventy percent as strong as the EMR wave that is being masked.

32.    In all of the reliable, published, peer-reviewed studies demonstrating noise field technology, the interfering EMR waves are produced actively by a power source.

33.    There are no reliable, published, peer-reviewed studies demonstrating that the interfering EMR waves necessary to create a noise field can be created passively without use of a power source.

34.    The claim that MRET is a passive noise field technology that is beneficial to human health is false.

35.    In support of its claims of MRET's efficacy, Global QuanTech cites a study performed at AltheaDx Technology on human astrocytes, from which it concludes that the study "confirmed that the application of MRET-Nylon chip on mobile phone reduced the negative

biological effect of microwave radiation by enhancing cell viability and resistivity to EMR thermal and non-thermal biological effects."

36.    The study performed at AltheaDx Technology does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

37.    In support of its claims of MRET's efficacy, Global QuanTech cites a study performed at RF Exposure Lab, LLC in the summer of 2006, which concluded, among other things, "that the application of MRET Polymer compound to RF phones does not lead to any significant distortion of transmitted RF signals."

38.    For noise field technology to work, it would require that the EMR signals be transmitted by the electronic device be distorted by the noise field shield.

39.    The study performed at RF Exposure Lab, LLC does not indicate either that EMR poses a danger to human health, that MRET technology can prevent any adverse effect of EMR on human health, or that MRET technology provides a passive noise field.

40.    In support of its claims of MRET's efficacy, Global QuanTech cites the results of a test on the specific absorption rate ("SAR") on a phantom head from exposure to a cellular phone both with and without MRET technology.

41.    The Federal Communications Commission has found that a safe level for exposure to EMR from cellular telephones is a SAR level of 1.6 watts per kilogram.

42.    The SAR test cited by Global QuanTech revealed that the exposure to the cellular phone without this technology falls within this limit.

43.     The SAR test cited by Global QuanTech does not does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

44.     In support of its claims of MRET's efficacy, Global QuanTech cites a study conducted on human blood *in vitro* at the laboratory of a medical center in Los Angeles, California. These blood samples were exposed to EMR from a computer monitor with and without an MRET device attached to the monitor. The study found that exposure to this EMR changed the ratio of various white blood cells.

45.     MRET's alleged method of operation would not cause a change in the ratio of various white blood cells.

46.     The test on *in virto* blood at the laboratory of a medical center in Los Angeles, California does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

47.     In support of its claims of MRET's efficacy, Global QuanTech cites a thermography test conducted at the SAMEER Centre for Electromagnetic, a division of the Research and Design Institution of the Ministry of Communications and Information Technology.

48.     Thermographic imaging is a type of infrared imaging that detects radiation in the infrared range of the electromagnetic spectrum and produces images of that radiation.

49.     The American Medical Association has found that the use of thermography for diagnostic purposes cannot be recommended in view of the lack of sufficient proof of effectiveness.

8

50.     The thermographic test conducted at the SAMEER Centre for Electromagnetic, a division of the Research and Design Institution of the Ministry of Communications and Information Technology does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

51.     In support of its claims of MRET's efficacy, Global QuanTech cites a "3D-MRA Test" conducted at Tex Chu Technology Corp. This test was conducted on a single human subject to determine the affect of MRET technology on blood flow in a brain exposed to EMR from a cell phone. Global QuanTech claims that the test "clearly" shows "the substantial negative effect of RF radiation generated by cellular phone on the state of blood vessels in all parts of the brain area and that MRET :compensates for this negative effect and helps to maintain the blood vessels of the brain in good state."

52.     MRET's alleged method of operation would not cause a change in the blood flow within the brain.

53.     The "3D-MRA Test" performed at Tex Chu Technology Corp. does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

54.     In support of its claims of MRET's efficacy, Global QuanTech cites a "Live Blood Cell Analysis" performed at Quantum Biotech Ltd. that purports to show some relationship between blood cells and exposure to EMR produced by a cell phone. Global QuanTech provides no information other than photographs of blood cells to explain this study.

55.     Quantum Biotech Ltd. is a company in the business of selling water filtration systems that use MRET technology. Its corporate internet homepage is www.mretwater.com.

9

56.     MRET's alleged method of operation would not cause a change in the properties of the blood.

57.     The "Live Blood Cell Analysis" performed at Quantum Biotech Ltd. does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

58.     In support of its claims of MRET's efficacy, Global QuanTech cites a study conducted at SA Biomedical Instrumentation Co., wherein a single subject had his or her brain activity recorded by electroencephalograph for a total of twelve minutes. Global QuanTech claims that the results of this study "proves that MRET-Shield neutralizes the electromagnetic stress and excitement caused by the effect of cellular phone on the brain functions."

59.     The electroencephalograph study conducted at SA Biomedical Instrumentation Co. that Global QuanTech cites in support of its claims of MRET's efficacy did not control for variables, such as ensuring that the study was conducted in a double-blind manner, in a manner sufficient to justify its conclusions.

60.     The electroencephalograph study conducted at SA Biomedical Instrumentation Co. that Global QuanTech cites in support of its claims of MRET's efficacy do not demonstrate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

61.     In support of its claims of MRET's efficacy, Global QuanTech cites a study purporting to conduct a test on thirty human subjects to verify the beneficial effects of MRET on the human immune system through the use of a quantum resonance spectrometer. A quantum resonance spectrometer is a device designed to detect ultra weak magnetic fields in order to see if

a "matter wave" emitted by one piece of matter is identical to the "matter wave" in the code of the detection device.

62.     MRET's alleged method of operation would not cause a change in the "matter waves" emitted by human beings.

63.     There is no established scientific basis and there are no controlled trials to support the usefulness of the quantum resonance spectrometer or that it can test any response of the human immune system.

64.     In support of its claims of MRET's efficacy, Global QuanTech cites a study conducted using the vibraimage method.  This method purportedly detects human emotions by registering micromovements by standard digital, web, or television cameras and image processing.

65.     MRET's alleged method of operation would not cause an emotional response in humans.

66.     There is no established scientific basis and there are no controlled trials to support the usefulness of the vibraimage method.

67.     In its marketing materials, BioPro claims that the effectiveness of its MRET technology has been substantiated through studies "conducted by prominent institutions and seasoned health practitioners" and that it performs "rigorous pre-market testing" on all of its products.     These studies, links to which BioPro provides on its website at http://www.bioprotechnology.com/Research_BIOPRO_Chips.aspx, are of two types.  The first are a series of studies using Meridian Stress Assessment Testing ("MSAS").  The second is a description of a thermographic imaging test.

11

68. MSAS testing is designed to test the flow of energy in the human body through a network of energy channels, called meridians.

69. MSAS testing has no established scientific basis and there are no controlled trials to support its usefulness. Therefore, it is not a useful tool for diagnosing dangers to human health.

70. Thermographic imaging is a type of infrared imaging that detects radiation in the infrared range of the electromagnetic spectrum and produces images of that radiation.

71. The American Medical Association has found that the use of thermography for diagnostic purposes cannot be recommended in view of the lack of sufficient proof of effectiveness.

72. In April 2008, claims regarding the efficacy of the MRET technology were studied and it was concluded that the information that BioPro presents in support of its claims were "science fiction" and that the technology "does nothing of what it claims."

73. Global QuanTech, BioPro, and Gia Wellness continue to market products with MRET technology as scientifically proven, even though there is no scientific evidence supporting their efficacy or mode of operation.

74. Upon information and belief, Igor Smirnov, Global QuanTech (collectively "Global QuanTech Defendants"), Alfred Hanser, Ray W. Grim, Jr., Lynda Cormier, Gary Merritt, Gia Wellness, and BioPro (collectively "BioPro Defendants") all knew that the tests performed on MRET technology described in paragraphs 30-72 did not provide scientific support for the claims of MRET's efficacy, mode of operation, or that it would provide any benefit to human health.

12

75.    Upon information and belief, the Global QuanTech Defendants and the BioPro Defendants all knew that products purporting to contain MRET technology offered no benefit to human health.

**C.    BioPro Defendants' sales operations.**

76.    BioPro operates a website at www.bioprotechnology.com, in which it allows customers to shop for products.

77.    BioPro's operations are controlled by Alfred Hanser, Ray Grimm, Jr., Lynda Cormier, and Gary Merritt.

78.    Gia Wellness operates a website at www.giawellness.com/2/index.html, in which it allows customers to shop for products.

79.    Gia Wellness's operations are controlled by Alfred Hanser, Lynda Cormier, and Gary Merritt.

80.    BioPro and Gia Wellness also market and sell their products through "independent consultants." These consultants are independent contractors who must pay BioPro and/or Gia Wellness for the right to market their products and are required to maintain a certain amount of both personal use of BioPro/Gia Wellness products and sales of those products of other in order to be considered an "active" independent consultant. BioPro and Gia Wellness provide their consultants with a web portal through which consumers can purchase BioPro or Gia Wellness products.

81.    BioPro and Gia Wellness provide their independent consultants with training, professional marketing tools, and materials to aid in the sale of BioPro and Gia Wellness products. These materials include some of the "evidence" for the efficacy of MRET technology discussed above.

13

82.   Gia Wellness has entered into an agreement with Direct Edge Media, Inc. to provide marketing materials discussing the healthful benefits of MRET technology to its independent consultants.

83.   Upon information and belief, BioPro entered into an agreement with a marketing company to provide marketing materials discussing the healthful benefits of MRET technology to its independent consultants.

84.   BioPro and Gia Wellness continually monitor their independent consultants. This monitoring can include daily communication and support one-on-one appointments, meetings, and conference calls.

85.   BioPro and Gia Wellness track the sales of their independent consultants to determine the compensation that those independent consultants have earned.

86.   BioPro tells its independent consultants that their "financial well-being is determined entirely by the number of people you positively impact with our products and business. The foundation of the BIOPRO business opportunity is the leading-edge science based technology that applies to major concerns of modern living."

**D.   Claims of specific medical conditions and diseases that the BioPro Defendants claim that their products containing MRET technology can prevent.**

87.   BioPro's marketing materials state that products manufactured, marketed, and sold by BioPro that contain MRET technology can prevent migraine headaches, neck pain, and fatigue in persons exposed to EMR.

88.   Scientific studies have shown that these self-reported symptoms attributed to exposure to EMR, such as headache, neck pain, and fatigue, are caused by the noncebo effect (an adverse non-specific effect that is caused by expectation or belief that something is harmful).

14

89.     There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent headache, neck pain, and fatigue caused by exposure to EMR, other than through the placebo effect (a beneficial, non-specific effect that is caused by expectation or belief that a treatment will positively change his condition).

90.     BioPro's marketing materials state that products manufactured, marketed, and sold by BioPro that contain MRET technology can prevent a significant increase in blood pressure due to EMR exposure.

91.     There is no established scientific basis and there are no controlled trials to support the statement that exposure to EMR can cause a significant increase in blood pressure.

92.     There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent a significant increase in blood pressure when a person is exposed to EMR.

93.     BioPro's marketing materials state that products manufactured, marketed, and sold by BioPro that contain MRET technology can prevent irreparable DNA breaks in brain cells due to EMR exposure.

94.     There is no established scientific basis and there are no controlled trials to support the assertion that exposure to EMR can cause irreparable DNA breaks in brain cells.

95.     There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent irreparable DNA breaks in brain cells due to EMR exposure.

96.    BioPro's marketing materials and independent consultants state that products manufactured, marketed, and sold by BioPro that contain MRET technology can prevent brain tumors from forming from exposure to EMR.

97.    There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent brain tumors from forming from exposure to EMR.

98.    BioPro's independent consultants state that products manufactured, marketed, and sold by BioPro that contain MRET technology can prevent prostate cancer arising from exposure to EMR.

99.    There is no established scientific basis and there are no controlled trials to support the assertion that exposure to EMR can cause prostate cancer.

100.    There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent prostate cancer due to EMR exposure.

101.    BioPro's independent consultants state that cellular phone companies in Europe use the same technology as BioPro to reduce the danger to human health from EMR, but that cellular phone companies in the United States do not do so.

102.    Cellular phone companies in Europe do not use technology similar to that used in the products manufactured, marketed, and sold by BioPro that contain MRET technology to reduce the potential harm to human health that EMR radiation could cause.

103.    BioPro's independent consultants distribute marketing materials that state that EMR from cellular phones can cause melanoma of the eye and state that products manufactured,

16

marketed, and sold by BioPro that contain MRET technology can prevent melanoma of the eye from exposure to EMR.

104. There is no established scientific basis and there are no controlled trials to support the assertion that exposure to EMR can cause melanoma of the eye.

105. There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent melanoma of the eye due to EMR exposure.

106. Upon information and belief, THE Global QuanTech Defendants and BioPro Defendants all knew that the claims of benefits to human health in paragraphs 87-105 were not supported by reliable scientific evidence and were false.

**E. Paul Catlin's purchase of a BioPro product.**

107. On January 24, 2010, Paul Catlin was approached by Judith Allen, a BioPro independent consultant in an effort to sell him a BioPro product.

108. Judith Allen handed Paul Catlin various BioPro marketing materials in an effort to convince him to purchase a BioPro product.

109. Judith Allen represented to Paul Catlin that cellular phone companies use the technology in the Cell Chip to protect the users of their products.

110. Judith Allen represented to Paul Catlin that other means of protecting himself from the dangers of electromagnetic radiation from cellular phones would be ineffective, but that the Cell Chip would be effective.

111. As a result of Judith Allen's representations and BioPro's marketing materials, Paul Catlin purchased a Cell Chip from Judith Allen.

17

## CLASS ACTION ALLEGATIONS

112.    Plaintiffs bring this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Class defined as follows:

> All entities or persons that paid, in whole or in part, for the purchase of any product from either BioPro Technology or Gia Wellness that purports to use MRET technology in order to provide a healthful benefit to humans from the dangers posed by electromagnetic radiation to the human body.

113.    Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, and Defendants' legal representatives, predecessors, successors, assigns, and employees.

114.    The definition of the Class is unambiguous. Plaintiff is a member of the Class that he seeks to represent. Members of the Class can be identified using databases that track sales of BioPro's products managed by BioPro in order to determine the compensation earned by its independent consultants and through orders placed through websites controlled by BioPro. Class members can be notified of the class action through publication and direct mailings to address lists maintained in the usual course of business by Defendants.

115.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members is unknown to Plaintiff, but it is clear that the number greatly exceeds the number to make joinder impossible.

116.    Common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

    a.    Whether EMR poses a risk to human health;

    b.    Whether MRET technology is capable of offering a protection to human health from the adverse affects of EMR;

18

c.  Whether the Defendants engaged in marketing practices intended to deceive the public regarding the efficacy of products purporting to contain MRET technology in preventing EMR from harming human health;

d.  Whether the Defendants were engaged in an unlawful enterprise designed to defraud the public into purchasing products purporting to contain MRET technology to protect themselves from damage to human health caused by EMR;

e.  Whether Defendants violated consumer protection statutes and/or false advertising statutes and/or state deceptive business practices statutes;

f.  Whether Defendants violated the common law of unjust enrichment; and

g.  The nature and extent of damages and other remedies to which the conduct of Defendants entitles the Class members.

117.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class members. Similar or identical statutory and common law violations and deceptive business practices are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

118.  The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts – Defendants' misconduct. In each case Defendants marketed products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body, despite the fact that the technology offers no such benefit.

119.  The Class members have been damaged by Defendants' misconduct. The Class members have paid for the products purporting to contain MRET technology that they would not have purchased in the absence of Defendants' marketing campaign.

120.  Plaintiff's claims are typical of the claims of the other Class members. Plaintiff paid for products purporting to contain MRET technology manufactured and marketed by BioPro and Gia Wellness for the purpose of protecting the human body against the harmful effects of EMR technology.

19

121.   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is familiar with the basic facts that form the bases of the Class members' claims. Plaintiff's interests do not conflict with the interests of the other Class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in Class action litigation and intends to prosecute this action vigorously. Plaintiff's counsel has successfully prosecuted complex Class actions, including consumer protection Class actions. Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the Class members.

122.   The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the Class members. The relief sought per individual member of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendants. Furthermore, it would be virtually impossible for the Class members to seek redress on an individual basis. Even if the Class members themselves could afford such individual litigation, the court system could not.

123.   Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system. The Class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar nature of the Class members' claims and the absence of material differences in the state statutes and common laws upon which the Class members' claims are based, a nationwide Class will be easily managed by the Court and the parties.

CAUSES OF ACTION

COUNT I
VIOLATION OF 18 U.S.C. § 1962(C)

124.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

125.    Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the MRET Unlawful Promotion Enterprise (the "Enterprise"), through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

126.    The Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of all of the Defendants, including their employees and agents, independent contractors, persons paid to perform tests on the efficacy and mode of operation of MRET's protection of the human body against harm caused by EMR, and the marketing and publication firms employed by Defendants to promote products purporting to contain MRET technology as offering protection to the human body from EMR. The Enterprise was an ongoing organization that functioned as a continuing unit. The Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. The Defendants are each a "person" distinct from the Enterprise.

127.    Defendants and the other members of the Enterprise created and maintained systematic links for a common purpose to aid in marketing products purporting to contain MRET technology as offering protection to the human body from EMR. Each of the participants in the Enterprise received substantial revenue from the scheme to promote products purporting to contain MRET technology as offering protection to the human body from EMR. Such revenue was exponentially greater than it would have been if products purporting to contain MRET technology as offering protection to the human body from EMR were marketed appropriately.

21

All participants were aware of Defendants' control over the activities of the Enterprise with respect to promoting products purporting to contain MRET technology as offering protection to the human body from EMR. Furthermore, each portion of the Enterprise benefited from the existence of other parts.

128.   The engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, or provided products purporting to contain MRET technology as offering protection to the human body from EMR to thousands of individuals and entities throughout the United States.

129.   Defendants have exerted control over the Enterprise and have managed the affairs of the Enterprise.

130.   Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1952 (use of interstate facilities to conduct unlawful activity).

131.   Defendants used thousands of mail and interstate wire communications to create and manage its fraudulent scheme. Defendants' scheme involved national marketing and sales plans and programs, and encompassed independent consultants, marketing firms, and victims across the country.

132.   Defendants' use of the mails and wires to perpetrate its fraud involved thousands of communications, including, but not limited to:

        a.    marketing materials and advertisements about the efficacy of products purporting to contain MRET technology to protect against damage to human health caused by EMR;

        b.    communications, including financial payments, with vendors, independent consultants, and the public discussing and relating to the publication of marketing materials, advertisements, and websites touting the efficacy of

products purporting to contain MRET technology to protect against damage to human health caused by EMR;

c.    communications with vendors, independent consultants. and the public that fraudulently misrepresented that products purporting to contain MRET technology to protect against damage to human health caused by EMR were scientifically proven to be safe, medically efficacious, and useful for that purposes;

d.    receiving the proceeds of Defendants' improper scheme.

133.    Defendants have communicated by United States mail, telephone, and facsimile with various independent consultants, in furtherance of Defendants' scheme.

134.    Defendants' pattern of racketeering activity includes acts indictable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. Defendants' fraudulent scheme consisted of, inter alia: deliberately misrepresenting that products purporting to contain MRET technology offered any protection against damage to human health caused by EMR so that Plaintiff and members of the Class paid for this product to treat conditions for which it was not scientifically proven to be safe and effective, and actively concealing and causing others to conceal, information about the true safety and efficacy of products purporting to contain MRET technology to treat conditions for which its efficacy had not been proven.

135.    In implementing its fraudulent scheme, Defendants were acutely aware that Plaintiffs and members of the Class depended on the honesty and integrity of Defendants in representing the efficacy of products containing MRET technology in protecting the human body against EMR. It is impractical and unduly expensive for Plaintiff and the Class to perform their own clinical trials or assemble all known medical evidence relating to the efficacy of products purporting to contain MRET technology as offering protection to the human body from EMR.

23

136. Defendants' scheme was calculated to ensure that Plaintiff and members of the Class would pay for products purporting to contain MRET technology to protect to the human body from EMR that Defendants knew would not offer the promised protection.

137. The conduct of the Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decision for the Enterprise to routinely conduct its transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

138. Defendants' fraudulent marketing scheme depended upon concealing their wrongful promotion of products purporting to contain MRET technology to protect to the human body from EMR. Indeed, the Enterprise was created precisely to make it appear to the public that Defendants did not have a hand in any such discussions or promotion of products purporting to contain MRET technology to protect to the human body from EMR. Additionally, as described above, Defendants had the Enterprise perform this promotion in the semblance of legitimate independent consultants' meetings, sales events, and seminars designed to attract new independent consultants. These activities and others described above concealed Defendants' fraudulent promotional activities and Plaintiff could not have discovered the scheme alleged herein earlier in the exercise of reasonable diligence. Indeed, much of the scheme to this day remains concealed by Defendants.

139. Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff could not reasonably have discovered the fraudulent nature of

24

Defendants' conduct. Accordingly, Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiff's claims.

140. The above described racketeering activities amounted to a common course of conduct intended to deceive and harm Plaintiff and members of the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Class. Defendants' racketeering activities are part of their ongoing business and constitute a continuing threat to the property of Plaintiff and members of the Class.

141. Plaintiff and members of the Class have been injured in their business and property by reason of these violations in that they have made millions of dollars in payment for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body that they would not have made had Defendants not engaged in their pattern of racketeering activity. By reason of the unlawful acts engaged in by Defendants, Plaintiff and members of the Class have suffered ascertainable loss and damages.

142. Plaintiff and members of the Class have sustained injuries that were directly and proximately caused by Defendants' racketeering activity as described above.

143. By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff and members of the Class for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d) BY
### CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)

144. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

25

145. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

146. Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the MRET Unlawful Marketing Enterprise, described previously, through a pattern of racketeering activity.

147. Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff of money.

148. The nature of the above-described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

149. As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and members of the Class have been and are continuing to be injured in their business or property as set forth more fully above. By reason of the unlawful acts engaged in by Defendants, Plaintiff and members of the Class have suffered ascertainable loss and damages.

150. Defendants sought and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

a. Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

b. Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

26

c. Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and,

d. Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

151. Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have spent millions of dollars for products purporting to contain MRET technology that they would not have spent had Defendants not conspired to violate 18 U.S.C. § 1962(c).

152. Injuries suffered by Plaintiff and member of the Class were directly and proximately caused by Defendants' racketeering activity as described above.

153. By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff and members of the Class for three times the damages Plaintiff and members of the Class have sustained, plus the cost of this suit, including reasonable attorney's fees.

COUNT III
VIOLATION OF STATE CONSUMER PROTECTION LAWS

154. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff on behalf of himself and members of the Class.

155. Plaintiff and the members of the Class are individuals and entities that paid for purchases of products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body on behalf of their members and beneficiaries who used products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body for personal, family, or household purposes.

156. Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the promotion and sale of products purporting to contain MRET technology as

27

protection against the harmful effects of EMR on the human body to Plaintiff and the proposed Class members.

157.    Defendants violated this duty by misrepresenting the characteristics, uses, benefits, quality, and intended purposes of products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body.

158.    Plaintiff and members of the Class were directly and proximately injured by Defendants' conduct and would not have paid for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body had Defendants not engaged in their deceptive marketing campaign.

159.    Defendants' deceptive representations and material omissions to Plaintiff and the proposed Class members were, and are unfair and deceptive acts and practices.

160.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff and the proposed Class members.

161.    Plaintiff and the Class members were deceived by Defendants' misrepresentations and omissions.

162.    As a proximate result of Defendants' misrepresentations and omissions, Plaintiff and the proposed Class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

163.    Defendants' actions, as complained of herein, constitute unfair compensation or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below.

164.    Specifically, Plaintiff alleges members of the Class seek redress under the following statutes, which allow corporations to bring consumer protection claims:

a.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 48-88-101, *et seq.*, including § 4-88-113(f), and § 4-88-102(5);

b.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, Cal. Civ. Code § 1761, *et seq.*, and Cal. Civ. Code § 1770, *et seq.*;

c.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-101, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110a. *et seq.*, including § 42-110(a)(3);

e.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*, including 6 Del. Code. § 2512;

f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

g.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

h.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Indiana Code Ann. § 24-5-0.5-1, *et seq.*;

i.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 501/1, *et seq.*;

j.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 M.R.S.A. 201, *et seq.*;

k.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Conn. Law Code § 13-101, *et seq.*, including § 13-101(h);

l.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of M.G.L.A. 93A § 1, *et seq.*;

m.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of M.C.L.A. § 445.901, *et seq.*, including § 445-902(c);

29

n. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

o. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 87-301, *et seq.* and Neb. Rev. Stat. § 59-1601, *et seq.*;

p. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

q. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358A:1(1):

r. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, including § 56:8-1(d);

s. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

t. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

u. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

v. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*, including § 51-15-01(4);

w. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Code § 1345.01, *et seq.*, including § 1345.01(B);

x. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. Tit. 15 § 751, *et seq.*;

y. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*, including § 646.605(4);

z. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*, including § 201-2(2);

aa.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*, including § 39-5-10(9);

bb.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*, including § 37-24-1(8);

cc.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*, including § 47-18-103(9);

dd.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. Com. Code § 17.41, et seq., including § 17.45(4);

ee.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.*;

ff.   Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*, including § 19.86.010(1);

gg.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Va. Code § 46A-6-101, *et seq.*;

hh.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

ii.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. Ann. § 40-12-101, *et seq.*

165.   Plaintiff and members of the Class were injured by Defendants' conduct because Plaintiff and members of the Class would not have paid for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body, absent Defendants' conduct. Plaintiff and Class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

166.    Plaintiff has provided notice to the Attorney General where required by state statute and have sent pre-suit demand letters where appropriate.

## COUNT IV
## VIOLATION OF COMMON LAW OF UNJUST ENRICHMENT

167.    The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff on behalf of himself and members of the Class.

168.    To the detriment of Plaintiff and members of the Class, Defendants have been, and continue to be, unjustly enriched as a result of the unlawful and/or wrongful collection of, inter alia, payments for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body.

169.    Defendants have unjustly benefited through the unlawful and/or wrongful collection of, *inter alia*, payments for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body and continue to benefit to the detriment and at the expense of Plaintiff and members of the Class.

170.    Accordingly, Plaintiff and members of the Class seek full restitution of Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class members request that the Court enter an order or judgment against Defendants including the following:

A.    Certification of the action as a Class Action pursuant to Rule 23(b)(2) of the Indiana Rules of Trial Procedure with respect to Plaintiffs' claims for injunctive relief, and Rule 23(b)(3) of the Indiana Rules of Trial Procedure with respect to the claims for damages, and appointment of Plaintiff as Class Representatives and their counsel of record as Class Counsel;

32

B.     Damages in the amount of monies paid for products purporting to contain MRET technology;

C.     Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

D.     Pre-judgment and post-judgment interest on such monetary relief;

E.     Equitable relief in the form of restitution, including restitutionary disgorgement into a fluid recovery fund, to restore monies received by Defendants as a result of the unfair, unlawful and/or deceptive conduct alleged in herein;

F.     Other appropriate injunctive relief;

G.     The costs of bringing this suit, including reasonable attorneys' fees; and

H.     All other relief to which Plaintiff and members of the Class may be entitled at law or in equity.

DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

PRICE WAICUKAUSKI & RILEY, LLC

William N. Riley, Atty. No. 14941-49
Brad A. Catlin, Atty. No. 21570-29
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Phone: (317) 633-8787
Fax: (317) 633-8797
Email: wriley@price-law.com
Email: bcatlin@price-law.com



# USPTO PATENT FULL-TEXT AND IMAGE DATABASE

| Home | Quick | Advanced | Pat Num | Help |

Bottom

View Cart  Add to Cart

Images

( 1 of 1 )

---

**United States Patent**

Smirnov

**6,369,399**

April 9, 2002

---

Electromagnetic radiation shielding material and device

### Abstract

A material and devices made therefrom are described when placed in proximity to persons, animals and plants serve to lessen adverse health effects caused by electromagnetic radiation (EMR) exposure. The material has a polymeric matrix and inorganic and organic components which are responsive to an magnetic field and emitting natural electromagnetic oscillations which are beneficial to humans, animals and plants, and offset harmful aspects of the EMR. The polymer is polar and has high relative permitivity. The components are an oxydated hydrocarbon emulsifier; a galvanic salt; an alkaloid; a dye or stain; and a polysaccharide. The devices may be solid, fibrous, powdered or woven fabrics.

---

Inventors: **Smirnov; Igor** (Carlsbad, CA)

Appl. No.: **09/510,460**

Filed:     **February 22, 2000**

---

| | |
|---|---|
| **Current U.S. Class:** | **250/515.1** ; 250/516.1 |
| **Current International Class:** | A61N 1/00 (20060101); A61N 1/16 (20060101); C23C 028/02 (); A61N 001/40 () |
| **Field of Search:** | 250/515.1,516.1,519.001 359/885,886 |

---

### References Cited [Referenced By]

*Primary Examiner:* Anderson; Bruce

*Assistant Examiner:* Quash; Anthony

*Attorney, Agent or Firm:* Brown Martin Haller & McClain

---

### Claims

EXHIBIT

*A*

I claim:

1. A material to reduce adverse effects of electromagnetic radiation exposure of a human, animal or plant body, comprising a polar polymeric matrix having high relative permitivity and having incorporated therein:

a. an oxydated hydrocarbon emulsifier;

b. a galvanic salt;

c. an alkaloid;

d. a dye or stain; and

e. a polysaccharide;

said material upon exposure to incident electromagnetic radiation responding thereto by emission of electromagnetic oscillations at frequencies which counter said adverse effects of said incident electromagnetic radiation on said body.

2. A material as in claim 1 wherein said polymeric matrix comprises an epoxy polymer.

3. A material as in claim 1 wherein said emulsifier comprises a glycol ether or salt thereof.

4. A material as in claim 1 wherein said polysaccharide comprises a phycocolloid.

5. A material as in claim 1 wherein said galvanic salt comprises an inorganic salt.

6. A material as in claim 4 wherein said inorganic salt comprises an inorganic phosphate.

7. A material as in claim 1 wherein said alkaloid comprises a parasympatholytic agent.

8. A material as in claim 7 wherein said parasympatholytic agent comprises an atropine derivative.

9. A material as in claim 1 wherein said dye or stain comprises fluorescein or a derivative thereof.

10. A material as in claim 9 wherein said dye or stain comprises a polyhalogen-substituted fluorescein.

11. A material as in claim 1 comprising, in parts per 1000 parts by weight of said polymer:

12. A material as in claim 11 comprising, in parts per 1000 parts by weight of said polymer:

13. A material as in claim 12 wherein said polymer comprises an epoxy polymer and further comprising, in parts per 1000 parts by weight of said epoxy polymer:

14. A material as in claim 1 formed as a unitary solid body.

15. A material as in claim 14 formed as a plurality of said solid bodies in the form of individual granules, said granules being disposed adjacent to each other as a constrained mass of form defined by a constraining container.

16. A material as in claim 1 formed as a fiber.

17. A material as in claim 16 comprising a woven fabric comprising a plurality of said fibers.

18. A material as in claim 17 comprising a woven fabric comprising a plurality of said fibers and fibers from at least a second type of fiber.

### Description

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention herein relates to exposure of living organisms to electromagnetic radiation (EMR). More particularly it relates to materials to reduce the harmful physiological effects that extended exposure to EMR may pose to the humans, animals and plants and devices made therefrom.

2. Description of the Prior Art

EMR is emitted by every operating electrical and electronic device. The power of EMR emission varies depending on the size and electrical strength of the device and the electrical current it carries or employs. High voltage power lines are significant emitters of EMR, and field strengths sufficiently high to have the potential for causing adverse EMR effects in humans, animals and plants can be detected hundreds of feet away. Smaller devices such as computers, television sets, microwave ovens and the like emit lesser quantities of EMR, but the effect on humans can still be significant because people are in much closer proximity to such devices.

While there has been controversy over whether significant health effects in humans has been proven or disproved by various studies, there is no doubt that EMR fields do surround power lines and common electrical and electronic devices. It is therefore the desire of many prudent people to protect themselves, their animals and plants against whatever health risks might be involved by their exposure to EMR over extended periods of time. Unfortunately, effective and convenient devices for shielding against EMR have not been generally available. Essentially the only defense against EMR has been removal of persons, animals and plants from proximity to the EMR-emitting devices. For major emitters such as power lines or electrical substations, this has usually meant that one has had to move to a different house or to a different job location away from the power line or substation, which commonly means substantial expense and inconvenience. The adverse costs and inconveniences are similar to farmers and ranchers who must move animals and crops to locations remote from the power lines or stations. For devices such as microwave ovens or computers, it has meant that a person must sit or stand at an awkward distance from the device, which can impair the person's ability to use the device in an optimum manner.

Because there is a magnetic field component to EMR, conventional shielding which might provide protection against electrical shock is not effective to shield against the effects of the generated magnetism on a human, animal and plant bodies and health.

Adverse human health effects which have been reported as attributable to long-term EMR exposure include occurrence of certain cancers, multiple sclerosis and autism. Reported adverse effects on animals have included stillbirths of young and reduction of milk production in cattle.

It would therefore be advantageous if there were a device available which could effectively shield people, animals and plants against harmful, adverse health consequences which may be inherent in prolonged or extended exposure to EMR.

## SUMMARY OF THE INVENTION

I have now invented a material which may be fabricated in numerous embodiments and which when worn, carried or otherwise kept in proximity to persons, animals and even plants, serves to lessen adverse health effects caused by EMR from power lines, computers, mobile telephones, microwave ovens, televisions and numerous other electrical and electronic devices. These EMR shielding materials and devices can be fabricated and used in many different embodiments. This enables the invention to be used effectively in many locations and under many circumstances where prior art devices were simply unavailable or ineffective.

Key to the present invention is a polymeric body into which are incorporated small quantities of inorganic and organic materials, those materials when placed in an EMR magnetic field, respond to that EMR by emitting natural electromagnetic oscillations which are beneficial to humans, animals and plants, and which at least in part counteract the harmful aspects of the EMR on the human, animal or plant. The polymeric material may be formed into devices of a wide variety of embodiments, including block solids, fibers, fabrics, particulate, and so forth.

Specifically, the invention herein comprises a material to reduce adverse effects of electromagnetic radiation exposure of a human, animal or plant body, comprising a polymeric matrix having high relative permitivity and having incorporated therein a) an oxydated hydrocarbon emulsifier; b) a galvanic salt; c) an alkaloid; d) a dye or stain; and e) a polysaccharide; the material upon exposure to incident electromagnetic radiation responding thereto by emission of electromagnetic oscillations at frequencies which counter the adverse effects of the incident electromagnetic radiation on the body. In a preferred embodiment the polymer is an epoxy polymer.

In preferred embodiments the material's composition comprises, in parts per 1000 parts by weight of the polymer:

the oxydated hydrocarbon emulsifier 10 mL the galvanic salt 1.3 parts by weight the alkaloid 2.6 parts by weight the dye or stain 2.3 parts by weight the polysaccharide 1.2 parts by weight.

The material may be disposed in a variety of different forms, but the common ones will be as unitary solid objects, often as small disks, or as fibers from which fabrics or garments may be woven.

Other aspects and embodiments of the present invention will be evident from the disclosure below.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of one embodiment of a device formed of the polymeric body of the present invention, and attached for convenience to a common object;

FIG. 2 is an oblique view of a polymeric material of the present invention in the form of a fiber;

FIG. 3 is a schematic, oblique enlarged view of a portion of a woven fabric containing fibers of FIG. 2.

FIG. 4 illustrates pictorially the effects on plant leaves of use of the present material to reduce the harmful effects of EMR exposure of the plant.

FIGS. 5 and 6 illustrate graphically the positive results obtained in blood tests involving use of the material of this invention to reduce the harmful effects of EMR exposure to human subjects.

## DETAILED DESCRIPTION AND PREFERRED EMBODIMENTS

In its most basic form, the invention here is a polymeric material in which the polymeric matrix contains small concentrations of several different types of components--an oxydated hydrocarbon emulsifier, a galvanic salt, an alkaloid, a dye or stain, and a polysaccharide. Collectively these components and the polymer form a unique composition which has the unusual ability, when activated by exposure to EMR, to generate its own electromagnetic oscillations at frequencies which resonate with cellular structures and effectively counteract the harmful aspects of the EMR. Thus when a person, animal or plant is exposed to EMR, having a device made of the present material on one's person or in close proximity will reduce the harmful effects which one may suffer from prolonged exposure to the EMR. As an example presented below shows, substantial reductions in the adverse effects on human blood by EMR exposure can be obtained by having a device made of the present material present in proximity to the exposed blood.

The polymer which forms the matrix of the present can be any polar thermosetting or thermoplastic polymer which has a high value of relative permittivity (dielectric constant). Numerous polar polymers are described in the literature; of particular preference in the present compositions are the epoxy polymers. As the matrix, the polymer will form the bulk of the present materials. The concentrations of the components discussed below are stated with respect to 1000 mg of the polymer.

A first component of the material is an emulsifier having solvent properties, which facilitates the incorporation of the components into the polymeric matrix. Numerous suitable emulsifiers are disclosed in the literature. Preferred in these compositions are glycol ethers or salts thereof. A particularly useful emulsifier is ethylene glycol monobutyl ether or its acetate salt (both available commercially under the respective trade names "Butyl Cellusolve" and "Butyl Cellusolve Acetate"). The emulsifier will be present in a concentration of 1-25 milliliters, preferably about 10 mL.

A second component is a galvanic salt which imparts galvanic properties to the composition. Numerous inorganic (and some organic) salts may be used, including the alkali metal and alkaline earth metal salts. The more reactive salts such as the sodium salts are preferred. The anions of the salts may be galvanically active ions such as the various forms of phosphates. Particularly preferred is dibasic sodium phosphate. The galvanic salt will be present in a concentration of 0.1-3.0 mg., preferably about 1.3 mg.

The third component will be an alkaloid which has parasympatholytic properties, and thus counteracts stimulation of the parasympathetic nervous system. Preferred alkaloids are atropine and its derivatives. Particularly preferred is tropine (C.sub.8 H.sub.15 NO) which is obtained by hydrolysis of atropine. The alkaloid will be present as 1.0-5.0 mg, preferably about 2.5-2.7 mg.

The fourth component will be a dye or stain, preferably fluorescein or a derivative thereof. Particularly preferred is rose bengal (C.sub.20 H.sub.2 O.sub.5 I.sub.4 Cl.sub.4 Na.sub.2), also known as 4,5,6,7-tetrachloro-2,4',5'7'-tetraiodofluorescein (sodium salt) and as "Acid Red 94". The dye or stain will be present as 0.5-3.0 mg, preferably about 2.0-2.5 mg.

Finally, the basic compositions herein will also contain a polysaccharide, preferably a phycocolloid. Particularly preferred are the phycocolloids derived from algae, such as seaweed. Preferred is agar (also known as agar-agar), which is a phycocolloid derived from the red algae such as Gelidium or Gracilaria and is a polysaccharide mixture of agarose and agaropectin. The polysaccharide will be present as 0.1-

3.0 mg, preferably 1.0-1.5 mg.

The polymeric materials of this invention are easily manipulated and can be formed into a wide variety of shapes and have a variety of different sizes. Two types of embodiments have been found particularly useful; see FIGS. 1-3. The first is to have the material formed as a unitary small device, such as a disk 2. In the embodiment shown in FIG. 1, the disk is formed as a hollow cylinder about 1" (2.5 cm) in diameter and 1/2' (1.2 cm) high with a wall 4 which forms a container into which the material 6 is placed. The material 6 being in a liquid form before the polymerization can be placed into the hollow interior where it hardens because of the polymerization reaction, or it can be in granular or powdered form and be packed into the interior. A cover 8 (shown in phantom) may be placed onto the disk 2 after placement of the polymeric material 6 if desired, but the cover is not required. The disk 2 may conveniently be mounted on a common object that a person would carry on his or her person or in a purse, such as a box 10 (perhaps a compact, keycase or the like), by use of a layer of adhesive 12. Larger or small versions of the disk may also be used.

In the alternative embodiment shown in FIGS. 2 and 3, the polymeric material is formed (such as by extrusion) into a fibrous form 14 from which it can be woven into a fabric 16. The individual fibers in the fabric 16 may all be made of the polymeric composition, but more preferably fibers of the polymeric composition will be distributed among a larger number of fibers of conventional fabric materials such as cotton or wool. Since the compositions of this invention are effective in relatively small quantities, as evident from the description of the disk 2 above, it will be understood that the fabric can be made into a garment to be worn, in which the garment is largely composed of the conventional fibers in the fabric, and that fibers of the present polymeric composition are a minor part of the actual garment.

While the mechanism of operation of the present materials and devices made therefrom is not known exactly, it is believed that the following may be applicable (but is not to be construed as limiting of the invention). The polar nature of the polymer allows both bonding and non-bonding electrons in the molecular structure of the polymer to be readily displaced by exposure to an external electromagnetic field. Thus the external electromagnetic field of the EMR creates in the molecular structure of the polymeric composition the excitation of electromagnetic forces which in turn amplifies the corona discharge effect of the polymer and assortment components. The result of this amplification is an emission of subtle electromagnetic oscillations originated by the polymer itself. It is these subtle electromagnetic oscillations which are beneficial to the adjacent human, animal or plant bodies and which serve to counteract or compensate for the negative effects on the various bodies. The recent discoveries in biophysics proved that certain subtle low frequencies can resonate with cellular structures and improve cellular function and metabolism. The different combinations of the inorganic and organic components incorporated into the polymeric matrix cause variations in the frequencies of the electromagnetic oscillations of the polymer, and thus produce varying effects in the different human, animal and plant organisms.

The beneficial effects of this material on humans exposed to EMR is illustrated by the following example. Blood samples were taken from twenty-two adult subjects. Each sample was divided into three parts. The first part was used as a control and was not exposed to EMR. The two remaining parts were exposed to the VLF (very low frequency) EMR emitted by an operating 14" computer monitor screen for one hour, positioned at a person's normal viewing distance of the screen. One of the two remaining parts was exposed to that VLF EMR without any shielding being present. The other part was exposed to that VLF EMR while a sample of the present material in the form of a solid body was positioned proximate to and directly below the screen. The specific composition used comprised an epoxy polymer with the following components (usually reported as mg per 1000 mg of the epoxy polymer): ethylene glycol monobutyl ether ("Butyl Cellusolve": 10 mL), sodium phosphate (1.3 mg), tropine (2.6 mg), rose bengal (2.3 mg) and agar (1.2 mg). After separation all three groups of sample parts were subjected to

standard blood testing. The test and their results (N=22) are reported in the Table below. The tests, as abbreviated in the Table, were as follows:

TABLE Blood Test Results Radiated % Radiated; % Test Control Shielded Dif. Unshielded Dif. WBC 6.6 K/.mu.L 6.7 K/.mu.L +1.5 6.6 K/.mu.L 0 LYM 36.0% 44.3% +23 49.4% +37 MID 18.0% 23.7% +31 24.2% +34 GRAN 46.0% 32.0% -30 26.4% -43 RBC 4.50 M/.mu.L 6.34 M/.mu.L +41 4.83 M/.mu.L +7 HGB 13.8 g/dL 14.6 g/dL +6 14.9 g/dL +8 HCT 28.7% 43.7% +52 44.5% +55 MCV 92 fL 92 fL 0 92 fL 0 MCH 30.7 pg 30.7 pg 0 30.8 pg +0.3 MCHC 32.1 g/dL 33.5 g/dL +4 33.5 g/dL +4 RDW 14.2% 14.4% +1 14.4% +1 PLT 208 K/.mu.L 193 K/.mu.L -7 197 K/.mu.L -5 WBC White blood cell count LYM Lymphocyte count within WBC MID "Minimum inhibitory dilution," an aspect of the Schlichter Test, and a measure of the presence of less frequently occurring and rare cells correlating to monocytes, eosinophils, basophils, blasts and other precursor white cells. GRAN Granulated cell count within WBC, corresponding to the granuloctyes, i.e., basophils, eosinophils and neutrophils. RBC Red blood cell count HGB Hemoglobin content HCT Hematocrit MCV Mean corpuscular volume MCH Mean corpuscular hemoglobin MCHC Mean corpuscular hemoglobin concentration RDW Red cell distribution width PLT Platelet content

The striking result which is evident from the above data, and which is reflected graphically in FIGS. 5 and 6, is the significant reduction in the decline of granulocyte content of the blood which was irradiated but shielded by the presence of the material of this invention. FIG. 5 illustrates the decline in granulocyte count in blood samples exposed to EMR for one hour without (--.DELTA.--) and with (--.smallcircle.--) shielding by the material of this invention, as compared to the granulocyte content of the non-exposed control samples (--.quadrature.--). FIG. 6 reflects the same data and illustrates the spread of the decline of the individual samples. As compared to the control the shielded group had one-third less decline in granulocyte content from the EMR exposure than did the non-shield group. Since granulocytes are a critical component of blood, and play one of the most important roles in the immune systems of the body. it is evident that the presence of the material of this invention protected the blood samples from significant amounts of harmful effects (i.e., content decline of granulocytes) resulting from the EMR exposure. The special point of interest is the significant increase of the red blood cells (RBC) in the shielded group. These cells play the major role in the process of oxygenation of the body. This result shows that the installation of the shielding device can positively affect the process of cellular oxygenation and as a result improve metabolism.

The increase of lymphocytes above normal level can also contribute to some negative effects such as leukemia, lymphomas, skin rash, etc. As compared to the control group the shielded group has about 40% less increase in lymphocytes content than the non-shielded group.

Another example of the effectiveness of the present compositions is illustrated in FIG. 4. The three views in this Figure are drawings of photographs of the leaves of a plant made by high-voltage photography. High-voltage photography is a process which allows the corona discharge effect of a body to be detected and captured for visual observation. The first view A is of the coronal discharge of a typical leaf of the plant before exposure to the VLF EMR from the computer monitor mentioned above. The solid image of the leaf indicates that all of the cells of the leaf are alive and functioning. In view B a leaf was exposed to the EMR for 30 minutes but in the presence of a shielding device of the present invention. The detect coronal discharge shows that about 80% of the cells have survived. In contrast, in view C, which shows a leaf exposed for the same 30 minutes but without the presence of the shielding device, in which only 40% of the cells have survived.

It will be evident that there are numerous embodiments of the present invention which are not expressly described above, but which are clearly within the scope and spirit of the invention. The above description is therefore to be considered exemplary only, and the actual scope of the invention is to be

defined solely by the appended claims.

\* \* \* \* \*

