UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL CATLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.  1:10-cv-0451-LJM-DML |
| | ) | |
| ACTIS GLOBAL VENTURES, INC., | ) | |
| LAMARCA UNLIMITED, LLC,ALFRED | ) | |
| HANSER, RAY W. GRIMM, JR.,LYNDA | ) | |
| CORMIER, GARY MERRITT,GLOBAL | ) | |
| QUANTECH, INC., and IGOR SMIRNOV, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Paul Catlin, for himself and all others similarly situated, by counsel, for the cause of action against the Defendants, alleges and states as follows:

### NATURE OF ACTION

1.     Plaintiff brings this action on behalf of himself and a class of similarly situated people (the "Class") to recover the millions of dollars paid to Defendants as a result of Defendants' unlawful scheme to market and sell products purported to protect humans from the dangers of harmful electromagnetic radiation ("EMR") through the use of noise field nano-technology, but which actually offer no such protection.  These products include, but are not limited to, the BIOPRO Cell Chip ("Cell Chip") and the BIOPRO Universal Chip ("Universal Chip"), both of which are manufactured by BioPro Technology ("BioPro") and purport to use noise field nano-technology to offer the promised protection.

2.     Plaintiff and members of the Class have been injured by the payment of money to Defendants BioPro and/or Gia Wellness for a product that cannot work as advertised and are entitled to restitution of the payments that they made to BioPro and/or Gia Wellness and disgorgement of the Defendants' wrongfully gotten gains.

<u>PARTIES</u>

3.     Plaintiff Paul Catlin is a citizen and resident of the State of Indiana and owns a home at 19601 Horton Road, Westfield, Hamilton County, Indiana.

4.     Defendant Actis Global Ventures, Inc. ("Actis") is a Nevada corporation with its principal place of business in the State of California.  Actis has been in the business of manufacturing, selling, and distributing products branded either as "BioPro" or "BioPro Technology" (hereinafter "BioPro") that combat "electropollution," including products purporting to use noise field nano-technology.

5.     Defendant LaMarca Unlimited, LLC ("LaMarca") is Nevada corporation with its principal place of business in the State of California.  LaMarca is in the business of manufacturing, selling, and distributing products branded as "BioPro" and "Gia Wellness" that combat "electropollution," including products purporting to use noise field nano-technology.

6.     Defendant Alfred Hanser is a resident of the State of California, was a director, President, and Secretary of Actis during the time that it sold products branded as "BioPro," and was Chief Executive Officer of LaMarca during the time that it sold products branded as "BioPro" and "Gia Wellness."

7.     Defendant Ray W. Grimm, Jr. is a resident of the State of California and was Chairman of the Board of Directors, Chief Executive Officer of Actis during the time that it sold products branded as "BioPro."

2

8.      Defendant Lynda Cormier is a resident of the State of California, was Vice-President of Sales of BioPro Technology while Actis was doing business as BioPro Technology during the time that it sold products branded as "BioPro," and was President of LaMarca during the time that it sold products branded as "BioPro" and "Gia Wellness."

9.      Defendant Gary Merritt is a resident of California, was Vice-President of Operations of BioPro Technology while Actis was doing business as BioPro Technology during the time that it sold products branded as "BioPro," and was Vice-President of Operations of LaMarca during the time that it sold products branded as "BioPro" and "Gia Wellness."

10.      Defendant Global QuanTech, Inc. ("Global QuanTech") is a California corporation with its principal place of business in the State of California. Global QuanTech is in the business of licensing and distributing products using a patented noise field nano-technology.

11.      Defendant Igor Smirnov is a resident of the State of California, is the founder of Global QuanTech, and directs Global QuanTech's activities.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action as the Plaintiff seeks remedy for consumer fraud; violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; and unjust enrichment based on the purchase of products sold by BioPro and Gia Wellness purporting to contain MRET technology in the State of Indiana for personal use in the State of Indiana.

13.      Jurisdiction may be exercised against Defendants because Defendants do business and seek sales of consumer products in the State of Indiana.

FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

A.    **MRET Technology & the BioPro- and Gia Wellness-Branded Products**

14.    Igor Smirnov invented a noise field nano-technology, known as Molecular Resonance Effect Technology ("MRET"), and patented this technology as United States Patent Number 6,369,399.[1]

15.    MRET is a technology that consists of a polymer containing an oxydated hydrocarbon emulsifier, a galvanic salt, a parasympatholytic agent, a dye or stain, and a polysaccharide.[2]  The patent for this technology states that when this material is exposed to EMR, it will respond "thereto by emission of electromagnetic oscillations at frequencies which counter the adverse effects of the incident electromagnetic radiation on the body."[3]

16.    Igor Smirnov founded and operates Global QuanTech in order to license the use of MRET technology to companies who seek to manufacture, market, and sell products purporting to contain MRET technology.

17.    Global QuanTech describes the method in which MRET works as "superimposing an optimal random field or 'noise field'" on man-made sources of EMR, "thus making the resulting field random and the exposure neutral on a biological level … without disturbing the functions and operations of your cell phone."  According to Global QuanTech, the MRET polymer "emits subtle low frequencies electromagnetic oscillations (the 'noise field') that resemble resonance frequencies of living cells in the body" when in the presence of an external

---

[1] Exhibit A, United States Patent Number 6,369,399.

[2] *Id.*

[3] *Id.*

electromagnetic field.  Global QuanTech states that the MRET polymer emits this noise field passively, without any power source.

18.     Global QuanTech, under the direction of Igor Smirnov, has licensed use of the MRET technology invented by Igor Smirnov to Actis and LaMarca for distributing products containing MRET technology in the United States.

19.     Global QuanTech is accepting proposals for distribution of products containing MRET technology outside of the United States.

20.     Upon information and belief, Actis and LaMarca are the only companies licensed to distribute products containing MRET technology in the United States.

21.     Actis and LaMarca manufacture, distribute, and sell products that purportedly use the MRET technology invented by Igor Smirnov.  These products include, but are not limited to, the BIOPRO Cell Chip and the BIOPRO Universal Chip, both of which are manufactured, distributed, and sold by BioPro and purport to use MRET technology to offer the promised protection.

22.     The Cell Chip is a BioPro-branded product manufactured and marketed by Actis and LaMarca and is a device consisting of a hard, black plastic shell in which the MRET polymer is contained.  The Cell Chip is designed to be adhered to an electronic device, such as a cell phone, personal digital assistant, or Bluetooth headset.  LaMarca manufactures, distributes, and sells a similar Gia Wellness-branded device called the Cell Guard.

23.     The Universal Chip is a BioPro-branded product manufactured and marketed by Actis and LaMarca and is a device consisting of a hard, black plastic shell in which the MRET polymer is contained.  The Universal Chip is designed to be applied to many electrical home

appliances. LaMarca manufactures, distributes, and sells a similar Gia Wellness-branded device called the Universal Guard.

24. Actis and LaMarca have written and distribute an instruction booklet that provides guidelines for uses of the Universal Chip/Guard. Those guidelines state that some electronic devices, such as toasters and laptop computers need only one Universal Chip/Guard, while others, such as cordless phones, vacuum cleaners, and automobiles, need two chips. This instruction booklet states that some electronic devices "may need … three or more [Universal Chips/Guards] depending on the nature of the device."

**B.    The Scientific Evidence Supporting the Claims of MRET's Efficacy and Method of Operation**

25. Global QuanTech, Actis, and LaMarca all state that MRET is a passive noise field technology that is beneficial to human health.

26. LaMarca markets MRET technology as part of a proprietary "GiaPlex" dual action technology.

27. LaMarca claims that the term "GiaPlex" is trademarked, but that trademark has not been registered with the United States Patent and Trademark Office.

28. Noise field technology uses EMR waves to mask the effect of other EMR waves on some types of cells.

29. Scientific studies have shown that the noise field effect works when the interfering EMR wave is randomly varied in the 50Hz to 120Hz range and contains a signal that is around seventy percent as strong as the EMR wave that is being masked.

30. In all of the reliable, published, peer-reviewed studies demonstrating noise field technology, the interfering EMR waves are produced actively by a power source.

31.     There are no reliable, published, peer-reviewed studies demonstrating that the interfering EMR waves necessary to create a noise field can be created passively without use of a power source.

32.     The claim that MRET is a passive noise field technology that is beneficial to human health is false.

33.     In support of its claims of MRET's efficacy, Global QuanTech cites a study performed at AltheaDx Technology on human astrocytes, from which it concludes that the study "confirmed that the application of MRET-Nylon chip on mobile phone reduced the negative biological effect of microwave radiation by enhancing cell viability and resistivity to EMR thermal and non-thermal biological effects."

34.     The study performed at AltheaDx Technology does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

35.     In support of its claims of MRET's efficacy, Global QuanTech cites a study performed at RF Exposure Lab, LLC in the summer of 2006, which concluded, among other things, "that the application of MRET Polymer compound to RF phones does not lead to any significant distortion of transmitted RF signals."

36.     For noise field technology to work, it would require that the EMR signals be transmitted by the electronic device be distorted by the noise field shield.

37.     The study performed at RF Exposure Lab, LLC does not indicate either that EMR poses a danger to human health, that MRET technology can prevent any adverse effect of EMR on human health, or that MRET technology provides a passive noise field.

38.     In support of its claims of MRET's efficacy, Global QuanTech cites the results of a test on the specific absorption rate ("SAR") on a phantom head from exposure to a cellular phone both with and without MRET technology.

39.     The Federal Communications Commission has found that a safe level for exposure to EMR from cellular telephones is a SAR level of 1.6 watts per kilogram.

40.     The SAR test cited by Global QuanTech revealed that the exposure to the cellular phone without this technology falls within this limit.

41.     The SAR test cited by Global QuanTech does not does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

42.     In support of its claims of MRET's efficacy, Global QuanTech cites a study conducted on human blood *in vitro* at the laboratory of a medical center in Los Angeles, California.   These blood samples were exposed to EMR from a computer monitor with and without an MRET device attached to the monitor.   The study found that exposure to this EMR changed the ratio of various white blood cells.

43.     MRET's alleged method of operation would not cause a change in the ratio of various white blood cells.

44.     The test on *in vitro* blood at the laboratory of a medical center in Los Angeles, California does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

45.     In support of its claims of MRET's efficacy, Global QuanTech cites a thermography test conducted at the SAMEER Centre for Electromagnetic, a division of the

Research and Design Institution of the Ministry of Communications and Information Technology.

46.     Thermographic imaging is a type of infrared imaging that detects radiation in the infrared range of the electromagnetic spectrum and produces images of that radiation.

47.     The American Medical Association has found that the use of thermography for diagnostic purposes cannot be recommended in view of the lack of sufficient proof of effectiveness.

48.     The thermographic test conducted at the SAMEER Centre for Electromagnetic, a division of the Research and Design Institution of the Ministry of Communications and Information Technology does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

49.     In support of its claims of MRET's efficacy, Global QuanTech cites a "3D-MRA Test" conducted at Tex Chu Technology Corp.  This test was conducted on a single human subject to determine the effect of MRET technology on blood flow in a brain exposed to EMR from a cell phone.  Global QuanTech claims that the test "clearly" shows "the substantial negative effect of RF radiation generated by cellular phone on the state of blood vessels in all parts of the brain area and that MRET :compensates for this negative effect and helps to maintain the blood vessels of the brain in good state."

50.     MRET's alleged method of operation would not cause a change in the blood flow within the brain.

51.     The "3D-MRA Test" performed at Tex Chu Technology Corp. does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

52.     In support of its claims of MRET's efficacy, Global QuanTech cites a "Live Blood Cell Analysis" performed at Quantum Biotech Ltd. that purports to show some relationship between blood cells and exposure to EMR produced by a cell phone. Global QuanTech provides no information other than photographs of blood cells to explain this study.

53.     Quantum Biotech Ltd. is a company in the business of selling water filtration systems that use MRET technology. Its corporate internet homepage is www.mretwater.com.

54.     MRET's alleged method of operation would not cause a change in the properties of the blood.

55.     The "Live Blood Cell Analysis" performed at Quantum Biotech Ltd. does not indicate either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

56.     In support of its claims of MRET's efficacy, Global QuanTech cites a study conducted at SA Biomedical Instrumentation Co., wherein a single subject had his or her brain activity recorded by electroencephalograph for a total of twelve minutes. Global QuanTech claims that the results of this study "proves that MRET-Shield neutralizes the electromagnetic stress and excitement caused by the effect of cellular phone on the brain functions."

57.     The electroencephalograph study conducted at SA Biomedical Instrumentation Co. that Global QuanTech cites in support of its claims of MRET's efficacy did not control for variables, such as ensuring that the study was conducted in a double-blind manner, in a manner sufficient to justify its conclusions.

58.     The electroencephalograph study conducted at SA Biomedical Instrumentation Co. that Global QuanTech cites in support of its claims of MRET's efficacy do not demonstrate

either that EMR poses a danger to human health or that MRET technology can prevent any adverse effect of EMR on human health.

59.    In support of its claims of MRET's efficacy, Global QuanTech cites a study purporting to conduct a test on thirty human subjects to verify the beneficial effects of MRET on the human immune system through the use of a quantum resonance spectrometer. A quantum resonance spectrometer is a device designed to detect ultra weak magnetic fields in order to see if a "matter wave" emitted by one piece of matter is identical to the "matter wave" in the code of the detection device.

60.    MRET's alleged method of operation would not cause a change in the "matter waves" emitted by human beings.

61.    There is no established scientific basis and there are no controlled trials to support the usefulness of the quantum resonance spectrometer or that it can test any response of the human immune system.

62.    In support of its claims of MRET's efficacy, Global QuanTech cites a study conducted using the vibraimage method. This method purportedly detects human emotions by registering micromovements by standard digital, web, or television cameras and image processing.

63.    MRET's alleged method of operation would not cause an emotional response in humans.

64.    There is no established scientific basis and there are no controlled trials to support the usefulness of the vibraimage method.

65.    In its marketing materials, Actis and LaMarca claim that the effectiveness of MRET technology has been substantiated through studies "conducted by prominent institutions

11

and seasoned health practitioners" and that it performs "rigorous pre-market testing" on all of its products. These studies, links to which Actis and/or LaMarca provide on the BioPro website at http://www.bioprotechnology.com/Research_BIOPRO_Chips.aspx, are of two types. The first is a series of studies using Meridian Stress Assessment Testing ("MSAS"). The second is a description of a thermographic imaging test.

66.     MSAS testing is designed to test the flow of energy in the human body through a network of energy channels, called meridians.

67.     MSAS testing has no established scientific basis and there are no controlled trials to support its usefulness. Therefore, it is not a useful tool for diagnosing dangers to human health.

68.     Thermographic imaging is a type of infrared imaging that detects radiation in the infrared range of the electromagnetic spectrum and produces images of that radiation.

69.     The American Medical Association has found that the use of thermography for diagnostic purposes cannot be recommended in view of the lack of sufficient proof of effectiveness.

70.     In April 2008, claims regarding the efficacy of the MRET technology were studied and it was concluded that the information that Actis and LaMarca present in support of their claims were "science fiction" and that the technology "does nothing of what it claims."

71.     Global QuanTech, Actis, and LaMarca continue to market products with MRET technology as scientifically proven, even though there is no scientific evidence supporting their efficacy or mode of operation.

72.     Upon information and belief, Igor Smirnov, Global QuanTech (collectively "Global QuanTech Defendants"), Alfred Hanser, Ray W. Grim, Jr., Lynda Cormier, Gary

Merritt, Actis, and LaMarca (collectively "BioPro Defendants") all knew that the tests performed on MRET technology described in paragraphs 30-72 did not provide scientific support for the claims of MRET's efficacy, mode of operation, or that it would provide any benefit to human health.

73.    Upon information and belief, the Global QuanTech Defendants and the BioPro Defendants all knew that products purporting to contain MRET technology offered no benefit to human health.

## C.    BioPro Defendants' sales operations

74.    Actis    and    LaMarca    operate    or    have    operated    a    website    at www.bioprotechnology.com, which allows customers to shop for products.

75.    Actis's operations are controlled by Alfred Hanser, Ray Grimm, Jr., Lynda Cormier, and Gary Merritt.

76.    LaMarca operates a website at www.giawellness.com/2/index.html, which allows customers to shop for products.

77.    LaMarca's operations are controlled by Alfred Hanser, Lynda Cormier, and Gary Merritt.

78.    Actis and LaMarca also market and sell their products through "independent consultants."    These consultants are independent contractors who must pay Actis and/or LaMarca for the right to market their products and are required to maintain a certain amount of both personal use of BioPro- or Gia Wellness-branded products and sales of those products of other in order to be considered an "active" independent consultant.  Actis and LaMarca provide their consultants with a web portal through which consumers can purchase BioPro- or Gia Wellness-branded products.

79.     Actis and LaMarca provide their independent consultants with training, professional marketing tools, and materials to aid in the sale of BioPro- and Gia Wellness-branded products.  These materials include some of the "evidence" for the efficacy of MRET technology discussed above.

80.     LaMarca has entered into an agreement with Direct Edge Media, Inc. to provide marketing materials discussing the healthful benefits of MRET technology to its independent consultants.

81.     Upon information and belief, both Actis and LaMarca entered into other agreements with marketing companies to provide marketing materials discussing the healthful benefits of MRET technology to its independent consultants.

82.     Actis and LaMarca continually monitor their independent consultants.   This monitoring can include daily communication and support one-on-one appointments, meetings, and conference calls.

83.     Actis and LaMarca track the sales of their independent consultants to determine the compensation that those independent consultants have earned.

84.     Actis and LaMarca tell their independent consultants that their "financial well-being is determined entirely by the number of people you positively impact with our products and business. The foundation of the BIOPRO business opportunity is the leading-edge science based technology that applies to major concerns of modern living."

**D.     Claims of specific medical conditions and diseases that the BioPro Defendants claim that their products containing MRET technology can prevent**

85.     The marketing materials for BioPro-branded products state that the products manufactured, marketed, and sold by Actis and LaMarca that contain MRET technology can prevent migraine headaches, neck pain, and fatigue in persons exposed to EMR.

14

86.     Scientific studies have shown that these self-reported symptoms attributed to exposure to EMR, such as headache, neck pain, and fatigue, are caused by the noncebo effect (an adverse non-specific effect that is caused by expectation or belief that something is harmful).

87.     There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent headache, neck pain, and fatigue caused by exposure to EMR, other than through the placebo effect (a beneficial, non-specific effect that is caused by expectation or belief that a treatment will positively change his condition).

88.     The marketing materials for BioPro-branded products state that the products manufactured, marketed, and sold by Actis and LaMarca that contain MRET technology can prevent a significant increase in blood pressure due to EMR exposure.

89.     There is no established scientific basis and there are no controlled trials to support the statement that exposure to EMR can cause a significant increase in blood pressure.

90.     There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent a significant increase in blood pressure when a person is exposed to EMR.

91.     The marketing materials for BioPro-branded products state that the products manufactured, marketed, and sold by Actis and LaMarca that contain MRET technology can prevent irreparable DNA breaks in brain cells due to EMR exposure.

92.     There is no established scientific basis and there are no controlled trials to support the assertion that exposure to EMR can cause irreparable DNA breaks in brain cells.

93.   There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent irreparable DNA breaks in brain cells due to EMR exposure.

94.   The marketing materials and independent consultants for BioPro-branded products state that the products manufactured, marketed, and sold by Actis and LaMarca that contain MRET technology can prevent brain tumors from forming from exposure to EMR.

95.   There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent brain tumors from forming from exposure to EMR.

96.   Independent consultants for BioPro-branded products state that products manufactured, marketed, and sold by Actis and LaMarca that contain MRET technology can prevent prostate cancer arising from exposure to EMR.

97.   There is no established scientific basis and there are no controlled trials to support the assertion that exposure to EMR can cause prostate cancer.

98.   There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by Actis and LaMarca that contain MRET technology to prevent prostate cancer due to EMR exposure.

99.   Independent consultants for BioPro-branded products state that cellular phone companies in Europe use the same technology as Actis and LaMarca to reduce the danger to human health from EMR, but that cellular phone companies in the United States do not do so.

100.   Cellular phone companies in Europe do not use technology similar to that used in the products manufactured, marketed, and sold by Actis and LaMarca that contain MRET technology to reduce the potential harm to human health that EMR radiation could cause.

101.    Independent consultants for BioPro-branded products distribute marketing materials that state that EMR from cellular phones can cause melanoma of the eye and state that products manufactured, marketed, and sold by Actis and LaMarca that contain MRET technology can prevent melanoma of the eye from exposure to EMR.

102.    There is no established scientific basis and there are no controlled trials to support the assertion that exposure to EMR can cause melanoma of the eye.

103.    There is no established scientific basis and there are no controlled trials to support the usefulness of products manufactured, marketed, and sold by BioPro that contain MRET technology to prevent melanoma of the eye due to EMR exposure.

104.    Upon information and belief, The Global QuanTech Defendants and BioPro Defendants all knew that the claims of benefits to human health in paragraphs 85-104 were not supported by reliable scientific evidence and were false.

**E.    Paul Catlin's purchase of a BioPro-branded product**

105.    On January 24, 2010, Paul Catlin was approached by Judith Allen, an independent consultant for BioPro-branded products, in an effort to sell him a BioPro-branded product.

106.    Judith Allen handed Paul Catlin various BioPro marketing materials in an effort to convince him to purchase a BioPro-branded product.

107.    Judith Allen represented to Paul Catlin that cellular phone companies use the technology in the Cell Chip to protect the users of their products.

108.    Judith Allen represented to Paul Catlin that other means of protecting himself from the dangers of electromagnetic radiation from cellular phones would be ineffective, but that the Cell Chip would be effective.

109.    As a result of Judith Allen's representations and the marketing materials, Paul Catlin purchased a Cell Chip from Judith Allen.

CLASS ACTION ALLEGATIONS

110.    Plaintiffs bring this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Class defined as follows:

> All entities or persons that paid, in whole or in part, for the purchase of any product from either BioPro Technology or Gia Wellness that purports to use MRET technology in order to provide a healthful benefit to humans from the dangers posed by electromagnetic radiation to the human body.

111.    Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, and Defendants' legal representatives, predecessors, successors, assigns, and employees.

112.    The definition of the Class is unambiguous.  Plaintiff is a member of the Class that he seeks to represent. Members of the Class can be identified using databases that track sales of BioPro-branded products managed by Actis and LaMarca in order to determine the compensation earned by its independent consultants and through orders placed through websites controlled by Actis and LaMarca.  Class members can be notified of the class action through publication and direct·mailings to address lists maintained in the usual course of business by Defendants.

113.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members is unknown to Plaintiff, but it is clear that the number greatly exceeds the number to make joinder impossible.

114.    Common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

      a.     Whether EMR poses a risk to human health;

b. Whether MRET technology is capable of offering a protection to human health from the adverse affects of EMR;

c. Whether the Defendants engaged in marketing practices intended to deceive the public regarding the efficacy of products purporting to contain MRET technology in preventing EMR from harming human health;

d. Whether the Defendants were engaged in an unlawful enterprise designed to defraud the public into purchasing products purporting to contain MRET technology to protect themselves from damage to human health caused by EMR;

e. Whether Defendants violated consumer protection statutes and/or false advertising statutes and/or state deceptive business practices statutes;

f. Whether Defendants violated the common law of unjust enrichment; and

g. The nature and extent of damages and other remedies to which the conduct of Defendants entitles the Class members.

115. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class members. Similar or identical statutory and common law violations and deceptive business practices are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

116. The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts – Defendants' misconduct. In each case Defendants marketed products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body, despite the fact that the technology offers no such benefit.

117. The Class members have been damaged by Defendants' misconduct. The Class members have paid for the products purporting to contain MRET technology that they would not have purchased in the absence of Defendants' marketing campaign.

118. Plaintiff's claims are typical of the claims of the other Class members. Plaintiff paid for products purporting to contain MRET technology manufactured and marketed by Actis

and LaMarca for the purpose of protecting the human body against the harmful effects of EMR technology.

119.   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is familiar with the basic facts that form the bases of the Class members' claims. Plaintiff's interests do not conflict with the interests of the other Class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in Class action litigation and intends to prosecute this action vigorously. Plaintiff's counsel has successfully prosecuted complex Class actions, including consumer protection Class actions. Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the Class members.

120.   The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the Class members. The relief sought per individual member of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendants. Furthermore, it would be virtually impossible for the Class members to seek redress on an individual basis. Even if the Class members themselves could afford such individual litigation, the court system could not.

121.   Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system. The Class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar nature of the Class members' claims and the absence of material differences in the state statutes and common laws upon which the Class members' claims are based, a nationwide Class will be easily managed by the Court and the parties.

CAUSES OF ACTION

COUNT I
VIOLATION OF 18 U.S.C. § 1962(C)

122.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

123.    Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the MRET Unlawful Promotion Enterprise (the "Enterprise"), through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

124.    The Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of all of the Defendants, including their employees and agents, independent contractors, persons paid to perform tests on the efficacy and mode of operation of MRET's protection of the human body against harm caused by EMR, and the marketing and publication firms employed by Defendants to promote products purporting to contain MRET technology as offering protection to the human body from EMR. The Enterprise was an ongoing organization that functioned as a continuing unit. The Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. The Defendants are each a "person" distinct from the Enterprise.

125.    Defendants and the other members of the Enterprise created and maintained systematic links for a common purpose to aid in marketing products purporting to contain MRET technology as offering protection to the human body from EMR.  Each of the participants in the Enterprise received substantial revenue from the scheme to promote products purporting to contain MRET technology as offering protection to the human body from EMR.  Such revenue was exponentially greater than it would have been if products purporting to contain MRET technology as offering protection to the human body from EMR were marketed appropriately.

All participants were aware of Defendants' control over the activities of the Enterprise with respect to promoting products purporting to contain MRET technology as offering protection to the human body from EMR. Furthermore, each portion of the Enterprise benefited from the existence of other parts.

126.  Defendants engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, or provided products purporting to contain MRET technology as offering protection to the human body from EMR to thousands of individuals and entities throughout the United States.

127.  Defendants have exerted control over the Enterprise and have managed the affairs of the Enterprise.

128.  Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1952 (use of interstate facilities to conduct unlawful activity).

129.  Defendants used thousands of mail and interstate wire communications to create and manage its fraudulent scheme. Defendants' scheme involved national marketing and sales plans and programs, and encompassed independent consultants, marketing firms, and victims across the country.

130.  Defendants' use of the mails and wires to perpetrate its fraud involved thousands of communications, including, but not limited to:

      a.    marketing materials and advertisements about the efficacy of products purporting to contain MRET technology to protect against damage to human health caused by EMR;

      b.    communications, including financial payments, with vendors, independent consultants, and the public discussing and relating to the publication of

marketing materials, advertisements, and websites touting the efficacy of products purporting to contain MRET technology to protect against damage to human health caused by EMR;

c.      communications with vendors, independent consultants, and the public that fraudulently misrepresented that products purporting to contain MRET technology to protect against damage to human health caused by EMR were scientifically proven to be safe, medically efficacious, and useful for that purposes;

d.      receiving the proceeds of Defendants' improper scheme.

131.    Defendants have communicated by United States mail, telephone, and facsimile with various independent consultants, in furtherance of Defendants' scheme.

132.    Defendants' pattern of racketeering activity includes acts indictable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. Defendants' fraudulent scheme consisted of, inter alia: deliberately misrepresenting that products purporting to contain MRET technology offered any protection against damage to human health caused by EMR so that Plaintiff and members of the Class paid for this product to treat conditions for which it was not scientifically proven to be safe and effective, and actively concealing and causing others to conceal, information about the true safety and efficacy of products purporting to contain MRET technology to treat conditions for which its efficacy had not been proven.

133.    In implementing its fraudulent scheme, Defendants were acutely aware that Plaintiffs and members of the Class depended on the honesty and integrity of Defendants in representing the efficacy of products containing MRET technology in protecting the human body against EMR. It is impractical and unduly expensive for Plaintiff and the Class to perform their own clinical trials or assemble all known medical evidence relating to the efficacy of products purporting to contain MRET technology as offering protection to the human body from EMR.

134.   Defendants' scheme was calculated to ensure that Plaintiff and members of the Class would pay for products purporting to contain MRET technology to protect to the human body from EMR that Defendants knew would not offer the promised protection.

135.   The conduct of the Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decision for the Enterprise to routinely conduct its transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

136.   Defendants' fraudulent marketing scheme depended upon concealing their wrongful promotion of products purporting to contain MRET technology to protect to the human body from EMR. Indeed, the Enterprise was created precisely to make it appear to the public that Defendants did not have a hand in any such discussions or promotion of products purporting to contain MRET technology to protect to the human body from EMR. Additionally, as described above, Defendants had the Enterprise perform this promotion in the semblance of legitimate independent consultants' meetings, sales events, and seminars designed to attract new independent consultants. These activities and others described above concealed Defendants' fraudulent promotional activities and Plaintiff could not have discovered the scheme alleged herein earlier in the exercise of reasonable diligence. Indeed, much of the scheme to this day remains concealed by Defendants.

137.   Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff could not reasonably have discovered the fraudulent nature of

Defendants' conduct. Accordingly, Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiff's claims.

138. The above described racketeering activities amounted to a common course of conduct intended to deceive and harm Plaintiff and members of the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Class. Defendants' racketeering activities are part of their ongoing business and constitute a continuing threat to the property of Plaintiff and members of the Class.

139. Plaintiff and members of the Class have been injured in their business and property by reason of these violations in that they have made millions of dollars in payment for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body that they would not have made had Defendants not engaged in their pattern of racketeering activity. By reason of the unlawful acts engaged in by Defendants, Plaintiff and members of the Class have suffered ascertainable loss and damages.

140. Plaintiff and members of the Class have sustained injuries that were directly and proximately caused by Defendants' racketeering activity as described above.

141. By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff and members of the Class for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

COUNT II
VIOLATION OF 18 U.S.C. § 1962(d) BY
CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)

142. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

25

143. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

144. Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the MRET Unlawful Marketing Enterprise, described previously, through a pattern of racketeering activity.

145. Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff of money.

146. The nature of the above-described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

147. As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and members of the Class have been and are continuing to be injured in their business or property as set forth more fully above. By reason of the unlawful acts engaged in by Defendants, Plaintiff and members of the Class have suffered ascertainable loss and damages.

148. Defendants sought and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

      a.     Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

      b.     Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

c.    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and,

d.    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

149.   Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have spent millions of dollars for products purporting to contain MRET technology that they would not have spent had Defendants not conspired to violate 18 U.S.C. § 1962(c).

150.   Injuries suffered by Plaintiff and member of the Class were directly and proximately caused by Defendants' racketeering activity as described above.

151.   By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff and members of the Class for three times the damages Plaintiff and members of the Class have sustained, plus the cost of this suit, including reasonable attorney's fees.

COUNT III
VIOLATION OF STATE CONSUMER PROTECTION LAWS

152.   The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff on behalf of himself and members of the Class.

153.   Plaintiff and the members of the Class are individuals and entities that paid for purchases of products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body on behalf of their members and beneficiaries who used products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body for personal, family, or household purposes.

154.   Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the promotion and sale of products purporting to contain MRET technology as

protection against the harmful effects of EMR on the human body to Plaintiff and the proposed Class members.

155.    Defendants violated this duty by misrepresenting the characteristics, uses, benefits, quality, and intended purposes of products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body.

156.    Plaintiff and members of the Class were directly and proximately injured by Defendants' conduct and would not have paid for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body had Defendants not engaged in their deceptive marketing campaign.

157.    Defendants' deceptive representations and material omissions to Plaintiff and the proposed Class members were and are unfair and deceptive acts and practices.

158.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff and the proposed Class members.

159.    Plaintiff and the Class members were deceived by Defendants' misrepresentations and omissions.

160.    As a proximate result of Defendants' misrepresentations and omissions, Plaintiff and the proposed Class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

161.    Defendants' actions, as complained of herein, constitute unfair compensation or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below.

162.    Specifically, Plaintiff alleges members of the Class seek redress under the following statutes, which allow corporations to bring consumer protection claims:

a.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 48-88-101, *et seq.*, including § 4-88-113(f), and § 4-88-102(5);

b.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, Cal. Civ. Code § 1761, *et seq.*, and Cal. Civ. Code § 1770, *et seq.*;

c.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-101, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110a, *et seq.*, including § 42-110(a)(3);

e.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*, including 6 Del. Code. § 2512;

f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

g.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

h.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Indiana Code Ann. § 24-5-0.5-1, *et seq.*;

i.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 501/1, *et seq.*;

j.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 M.R.S.A. 201, *et seq.*;

k.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Conn. Law Code § 13-101, *et seq.*, including § 13-101(h);

l.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of M.G.L.A. 93A § 1, *et seq.*;

m.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of M.C.L.A. § 445.901, *et seq.*, including § 445-902(c);

n.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

o.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 87-301, *et seq.* and Neb. Rev. Stat. § 59-1601, *et seq.*;

p.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

q.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358A:1(1);

r.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, including § 56:8-1(d);

s.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

t.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

u.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

v.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*, including § 51-15-01(4);

w.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Code § 1345.01, *et seq.*, including § 1345.01(B);

x.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. Tit. 15 § 751, *et seq.*;

y.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*, including § 646.605(4);

z.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*, including § 201-2(2);

aa.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*, including § 39-5-10(9);

bb.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*, including § 37-24-1(8);

cc.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*, including § 47-18-103(9);

dd.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. Com. Code § 17.41, et seq., including § 17.45(4);

ee.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.*;

ff.     Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*, including § 19.86.010(1);

gg.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Va. Code § 46A-6-101, *et seq.*;

hh.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

ii.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. Ann. § 40-12-101, *et seq.*

163.     Plaintiff and members of the Class were injured by Defendants' conduct because Plaintiff and members of the Class would not have paid for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body, absent Defendants' conduct. Plaintiff and Class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

164.    Plaintiff has provided notice to the Attorney General where required by state statute and have sent pre-suit demand letters where appropriate.

COUNT IV
VIOLATION OF COMMON LAW OF UNJUST ENRICHMENT

165.    The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff on behalf of himself and members of the Class.

166.    To the detriment of Plaintiff and members of the Class, Defendants have been, and continue to be, unjustly enriched as a result of the unlawful and/or wrongful collection of, *inter alia*, payments for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body.

167.    Defendants have unjustly benefited through the unlawful and/or wrongful collection of, *inter alia*, payments for products purporting to contain MRET technology as protection against the harmful effects of EMR on the human body and continue to benefit to the detriment and at the expense of Plaintiff and members of the Class.

168.    Accordingly, Plaintiff and members of the Class seek full restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class members request that the Court enter an order or judgment against Defendants including the following:

A.    Certification of the action as a Class Action pursuant to Rule 23(b)(2) of the Indiana Rules of Trial Procedure with respect to Plaintiffs' claims for injunctive relief, and Rule 23(b)(3) of the Indiana Rules of Trial Procedure with respect to the claims for damages, and appointment of Plaintiff as Class Representatives and their counsel of record as Class Counsel;

B.      Damages in the amount of monies paid for products purporting to contain MRET technology;

C.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

D.      Pre-judgment and post-judgment interest on such monetary relief;

E.      Equitable relief in the form of restitution, including restitutionary disgorgement into a fluid recovery fund, to restore monies received by Defendants as a result of the unfair, unlawful and/or deceptive conduct alleged in herein;

F.      Other appropriate injunctive relief;

G.      The costs of bringing this suit, including reasonable attorneys' fees; and

H.      All other relief to which Plaintiff and members of the Class may be entitled at law or in equity.

DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

PRICE WAICUKAUSKI & RILEY, LLC

/s/ Brad A. Catlin
William N. Riley, Atty. No. 14941-49
Brad A. Catlin, Atty. No. 21570-29
Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN  46204
Phone:  (317) 633-8787
Fax:  (317) 633-8797
Email:  wriley@price-law.com
           bcatlin@price-law.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that an exact and true copy of the foregoing has been filed electronically on this _____ day of October, 2010. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system:

> J. Michael Antrim
> Eric M. Douthit
> Alexander P. Pinegar
> Martin Risacher
> Steven M. Lutz
> CHURCH, CHURCH, HITTLE & ANTRIM
> antrim@cchalaw.com
> edouthit@cchalaw.com
> apinegar@cchalaw.com
> risacher@cchalaw.com
> lutz@cchalaw.com
>
> James P. Hanlon
> Kevin M. Kimmerling
> Paul Wolfla
> BAKER & DANIELS LLP
> jphanlon@bakerd.com
> kevin.kimmerling@bakerd.com
> paul.wolfla@bakerd.com

/s/ Brad A. Catlin_____
Brad A. Catlin

34

## USPTO PATENT FULL-TEXT AND IMAGE DATABASE



| Home | Quick | Advanced | Pat Num | Help |

| Bottom |

| View Cart | Add to Cart |

| Images |

( 1 of 1 )

---

**United States Patent**                                      **6,455,770**
Pulver                                              **September 24, 2002**

---

Electromagnetic radiation shield for attenuating electromagnetic radiation from an active electronic device

### Abstract

A shield for attenuating the strength and density of electromagnetic radiation emitted by electronic components includes two parallel conductors separated by an insulator. The shields are installed on the surface of electronic components by an adhesive.

---

Inventors: **Pulver; Lee J.** (Los Gatos, CA)
Appl. No.: **09/784,849**
Filed:     **February 15, 2001**

### Related U.S. Patent Documents

| Application Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|
| 887959 | Jul., 1997 | | |

---

Current U.S. Class:          **174/394** ; 257/E23.114; 428/620; 428/621
Current International Class:   H05K 9/00 (20060101); H01L 23/552 (20060101); H05K 009/00 ()
Field of Search:             174/35MS,35R 361/816,818,800 428/620,621

---

### References Cited [Referenced By]

#### U.S. Patent Documents

| | | |
|---|---|---|
| 4647714 | March 1987 | Goto |
| 4749625 | June 1988 | Obayashi et al. |
| 4896001 | January 1990 | Pitts et al. |



EXHIBIT

A

| | | |
|---|---|---|
| 4978812 | December 1990 | Akeyoshi et al. |
| 4980223 | December 1990 | Nakano et al. |
| 4980564 | December 1990 | Steelmon |
| 5557064 | September 1996 | Isern-Flecha et al. |
| 5574249 | November 1996 | Lindsay |
| 5889316 | March 1999 | Strobel et al. |

**Other References**

JKraus; D.Fleisch; "Electromagnetics with Applications"; McGraw-Hill; Fifth Edition, Chapter 2--Electric And Magnetic Fields; pp. 35-118; 1999 (No Month). .
J.Kraus; D.Fleisch; "Electromagnetics with Applications"; McGraw-Hill; Fifth Edition, Chapter 5--Antennas, Radiation, And Wireless Systems; pp. 247-356; 1999 (No Month). .
C.Paul, K Whites, S.Nasar; "Introduction to Electromagnetic Fields"; McGraw-Hill; Third Edition, Chapter 9--Antennas; pp. 583-647; 1998 (No Month)..

*Primary Examiner:* Ngo; Hung V.
*Attorney, Agent or Firm:* Lyon & Lyon LLP

*Parent Case Text*

CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of Ser. No. 08/887,959, filed Jul. 3, 1997, abandoned.

*Claims*

I claim:

1. An electromagnetic shield which can be affixed to an electronic component comprising: a topmost layer; a first conductive layer disposed beneath said topmost layer; an insulating layer disposed beneath said first conductive layer, said first conductive layer comprising: (a) a first semiconductor layer; (b) a fibrous layer disposed beneath said first semiconductor layer; (c) a second semiconductor layer disposed beneath said fibrous layer; a second conductive layer disposed beneath said insulating layer; an inner layer disposed beneath said second conductive layer; and an adhesive layer disposed beneath said inner layer.

2. The shield of claim 1 wherein said topmost layer and said inner layer comprise a polyester material.

3. The shield of claim 1 wherein said topmost layer and said inner layer comprise a lacquer material.

4. The shield of claim 1 wherein said first conductive layer and said second conductive layer comprise an aluminum alloy.

5. The shield of claim 1 wherein said first semiconductor layer and said second semiconductor layer

comprise a paraffin-based resin glue.

6. The shield of claim 1 wherein said shield has a cornerless shape.

*Description*

SPECIFICATION

1. Field of the Invention

The present invention relates in general to reduction of stray electromagnetic radiation emissions produced by electronic systems and more specifically to apparatus for shielding stray electromagnetic radiation.

2. Background of the Invention

Electronic systems (e.g., electrical circuits, etc.) which operate on alternating current ("AC") or direct current ("DC") voltage generate an electromagnetic field. An electromagnetic field is comprised of waves. Such fields are created because of the electrical energy being used in the devices. In most countries, agencies like the Federal Communications Commission (FCC) in the United States, Industry Canada (ICAN) in Canada, and Bundesamt Fur Post Und Telekommunikation-Zulassen Und Testen (BZT) in Germany regulate maximum amplitudes for radiated and conducted electromagnetic energy permissible at specific frequencies.

Unintentional radiators include electronic systems such as personal computers and computer networking hardware. Intentional radiators include electronic systems such as transmitters and regenerative receivers. This is by no means an exhaustive list of unintentional and intentional radiators, as various other electronic systems produce unwanted stray electromagnetic radiation emissions. Such unwanted electromagnetic radiation includes radio frequency, electrostatic and magnetic fields. As the operating speeds of these electronic systems increase, the strength of the electromagnetic fields increase. For example, present personal computers can operate at speeds above two hundred megahertz ("MHz"). These operating speeds will only increase in the future.

Stray electromagnetic fields are highly undesirable, as they can cause interference with other electronic devices, radio frequency communications systems, etc. Because of this, governmental agencies of many agencies have issued regulations which specify the maximum amplitude of stray unwanted electromagnetic radiation that an electronic system can emit and still be used in that country. If a product does not meet these specifications, it cannot be sold in that country.

Each of the government agencies has specific testing methodologies. In general, the stray electromagnetic radiation of an electronic system is measured using an antenna placed at least three meters from an electronic system on a calibrated test site. The field strength per meter of the stray fields is measured. In general, stray fields have strength with an order of magnitude in the one hundred microvolts range when the frequency is between thirty MHz and eighty-eight MHz. When recorded field strength exceeds the limit imposed by agencies such as the FCC, the electronic system must be redesigned so that it complies with those specifications. Electronic system redesign and implementation into production can delay product introduction by several months.

At present, a common method to reduce the stray electromagnetic energy produced by an electronic

system is to encase the electronic system in a continuous metal enclosure. If there are no seams in an enclosure, then electromagnetic energy is contained since a Faraday Cage has essentially been built around the electromagnetic energy source. When designing such an enclosure, the amplitude and frequency of the stray electromagnetic field determines its thickness. Regardless of the thickness, however, the shielding properties of the enclosure are compromised if system being shielded has any input/output ports, data cables, displays, etc. that cannot be shielded. Because of this, additional shielding must usually be added to the enclosures, cables, displays, keyboards, etc. to assure compliance to the FCC recommendations. These additional technologies add significant product cost and development time, and detract from the cosmetics of a final product.

Summarizing, while effective, these enclosures are heavy, add cost, and reduce the appeal of the product, especially if it is intended for the consumer market. Furthermore, it is entirely possible that this shielding might not even be necessary. Thus, a product could be designed with such shielding, thereby greatly adding to its cost, when the shielding was not even necessary.

In addition, in an attempt to make products that are more attractive and/or less expensive, the electronics industry also uses plastic enclosures. If an electronic system operating inside a plastic enclosure exceeds electromagnetic interference limits allowed by the regulatory agency, a metallized surface may be applied to the plastic enclosure in attempt to transform the interior of the plastic enclosure into a metal enclosure. The cost of this technology can be prohibitive, however, because the top and bottom sections of the enclosure must exhibit electrical continuity at the seams, while maintaining a uniform thickness over the entire enclosure surface. This is difficult to achieve.

Another common method for reducing stray electromagnetic radiation is to change the location of components in an electronic system. For example, a designer might change the location of the system's crystal oscillator to place it closer to the circuit receiving the signal. This will reduce the length of the signal path (i.e., the connecting wire or printed circuit board trace) and therefore might reduce the stray electromagnetic radiation emitted. The problem with this particular method is that it requires a redesign of the electronic system. This increases the cost of the product and significantly delays the product from entering the market. In addition, there is no way of knowing if the redesign actually worked until it is retested. When it is retested, the redesigned product may still exceed the specifications for maximum stray electromagnetic radiation. Many times, a third redesign must be undertaken. This costs time and money.

Examples of the specifications for the maximum stray electromagnetic radiation that a product must satisfy to be sold in the United States include:

dB microvolt/meter FREQUENCY (MHz) (dB .mu.V/m) microvolt/meter (.mu.V/m) 30 to 88 40.00 100 88 to 216 43.50 150 216-960 46.00 200 960-1000 54.00 500

These specifications, which have been issued by the FCC as of the filing date of this application, are measured from a position three meters from the electronic system undergoing test.

Examples of specifications that are in force in Europe include:

dB microvolt/meter FREQUENCY (MHz) (dB .mu.V/m) microvolt/meter (.mu.V/m) 30-230 40.46 105.44 230-1000 47.46 236.05

These are also measured at a distance of three meters from the electronic system undergoing test. These three meter limits are mandated in the specification EW 55022/CISPR 22, which is entitled "Limits and Methods of Measurement of Radio Disturbance Characteristics of Information Technology Equipment."

Furthermore, according to the newest European criteria, many products must continue to operate and be less susceptible to a field of three volts per meter from twenty-seven MHz to five hundred MHz to be allowed entry into the marketplace for sale. This is known as susceptibility. These criteria for susceptibility is best represented by the following product standards: IEC 801-2 Electromagnetic Compatibility for Industrial-Process Measurement and Control Equipment. Part 2: Electrostatic Discharge Requirements. 1984 IEC 801-3 Electromagnetic Compatibility for Industrial Process Measurement and Control Equipment. Part 3: Radiated Electromagnetic Field Requirements. 1984 IEC 801-4 Electromagnetic Compatibility for Industrial Process Measurement and Control Equipment. Part 4: Electrical Fast Transient. 1988.

An example of an electronic system that is particularly prone to producing stray fields is a laptop computer system. Prior to being marketed for sale or being sold, a laptop computer system must be tested by a FCC registered testing laboratory. The product must comply with the Code of Federal Regulations, Title 47, Part 2 entitled Frequency Allocations and Radio Treaty Matters; General Rules and Regulations; and Part 15 entitled Radio Frequency Devices, Oct. 1, 1996 edition. If the product does not pass this testing, it cannot be marketed for sale or sold. Laptop computer systems represent a fast paced electronic system technology that must be introduced into the market quickly. If the laptop computer system fails the testing described above, it must be redesigned prior to sale, thereby resulting in delay. Delay in releasing the product to the market can result in obsolescence before the first unit is sold. The testing and redesign stage of product compliance can sometimes be the critical path for product or company success

Compounding the above-described problems is that when designing electronic systems, it is difficult to predict the type and amount of stray fields that will be created; Because of this, designers either design their product without these radiation reducing features and accept the risk of product delays should the product fail testing, or implement potentially unnecessary field control structures (e.g., a metal enclosure). However, product delays can be fatal for many products, as time-to-market is extremely important in the modem marketplace. This is especially true in the electronics market. For example, technology and consumer tastes for personal computers generally change within a matter of months. If a product must be redesigned before it can be sold, it probably will never be sold. On the other hand, unnecessary field control structures increase the product's cost, thereby increasing the chance for the product's failure in the marketplace.

Thus, there has been a long felt need for an inexpensive apparatus that reduces stray electromagnetic radiation of products without requiring a product redesign or heavy shielding.

SUMMARY OF THE INVENTION

The present invention overcomes the problems and disadvantages of the prior art through a unique electromagnetic radiation shield. A shield or tab is disclosed. The shield of the present invention comprises a first conductive layer and a second conductive layer separated by an insulator. In a preferred embodiment, the first conductive layer and second conductive layer comprise a flexible aluminum alloy. The insulating layer of the preferred embodiment comprises a fibrous material that is bonded to the first conductive layer and second conductive layer by paraffin-based glue. The second conductive layer has an adhesive on the exterior thereof for affixing the shield or tab to a component that emits unwanted electromagnetic radiation. If desired, the first conductive layer can have a material applied to the exterior thereof that allows printing images thereon.

The various embodiments of the present invention are installed on the surface of electronic devices that are emitting unwanted electromagnetic radiation. If during testing, a product emits unacceptable

amplitudes and/or frequencies of eletromagnetic radiation, measurements can be taken in the vicinity of the electronic components installed therein. The shields of the present invention can be installed on the surface of selected electronic components of the apparatus in the field. Then the product can be immediately retested.

Selection of the electronic components that will have the shields of the present invention installed therein varies from apparatus to apparatus. In some applications, the shields can be placed only on those components exhibiting unacceptable electromagnetic radiation performance. In other cases, the shields of the present invention will be placed on several components of the apparatus.

The above and other preferred features of the invention, including various novel details of implementation and combination of elements will now be more particularly described with reference to the accompanying drawings and pointed out in the claims. It will be understood that the particular methods and circuits embodying the invention are shown by way of illustration only and not as limitations of the invention. As will be understood by those skilled in the art, the principles and features of this invention may be employed in various and numerous embodiments without departing from the scope of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

Reference is made to the accompanying drawings in which are shown illustrative embodiments of aspects of the invention, from which novel features and advantages will be apparent.

FIG. 1 is a perspective, section view of a stray electromagnetic shield of the present invention.

FIG. 2 is a perspective view of a stray electromagnetic shield of the present invention being affixed to an electronic device.

FIG. 3 is a perspective, section view of a presently preferred stray electromagnetic shield of the present invention constructed in accordance with the teachings of the present invention.

FIG. 4 is a simplified drawing showing an effect of the stray electromagnetic shield of the present invention.

FIG. 5 is a simplified drawing showing an effect of the stray electromagnetic shield of the present invention.

FIG. 6 is a simplified drawing showing an effect of the stray electromagnetic shield of the present invention.

FIG. 7 is a simplified drawing showing an effect of the stray electromagnetic shield of the present invention.

FIG. 8 is a simplified drawing showing an effect of the stray electromagnetic shield of the present invention.

FIG. 9 is a simplified drawing showing an effect of the stray electromagnetic shield of the present invention.

FIG. 10 shows an example of a printed circuit board having electromagnetic shields of the present invention installed on several of the electronic components located thereon.

FIG. 11 shows an example of a printed circuit board having electromagnetic shields of the present invention installed on several of the electronic components located thereon and the field created by the installation of the shields.

FIG. 12 is a simplified drawing showing an effect of the stray electromagnetic shield of the present invention when in the vicinity of electronic components located thereon.

FIG. 13 is a simplified perspective drawing showing a shield of the present invention installed in a curvilinear fashion.

FIG. 14 is a simplified perspective drawing showing a shield of the present invention installed in a curvilinear fashion.

DETAILED DESCRIPTION OF THE DRAWINGS

Turning to the figures, the presently preferred apparatus and methods of the present invention will now be described.

With reference to FIG. 1, sectional view of an exemplary shield 10 of the present invention is shown. The shield 10 of the present invention is comprised of a first conductive layer 15, an insulating layer 20, and a second conductive layer 25. In use, the shield 10 is affixed to the top of a package of an electronic component 30, as shown in FIG. 2 and as will be described below. Such a component could be an integrated circuit (e.g., a microprocessor), an oscillator, a power supply, etc.

With reference to FIG. 3, a sectional view of a presently preferred embodiment 100 of the present invention is shown. The topmost layer 105 of the shield 100 can comprise a polyester material which can have information printed thereon. This topmost layer 105 can also be a lacquer type material facing outward toward the operating environment. Information can be printed on the shield with any type of ink compatible with the material used on the topmost layer. This information could display, for example, identifying information such as the part number and manufacturing location of the component which will have the shield affixed thereto. In the presently preferred embodiment, layer 105 comprises a one hundred eighty degrees Centigrade, 0.0102 millimeter thick, gold-colored liquid lacquer coating that is applied directly to the first conductive layer 110 (see discussion of first conductive layer 110 below). This material is chosen because ink can be applied thereon during a high speed printing process without smearing. It is noted that powder-type lacquers will not provide satisfactory results.

Below the outermost layer 105 is a first conductive layer 110. First conductive layer 110 can be constructed of any material that can conduct the electromagnetic field radiated by the electronic device which has the shield 100 mounted thereupon. In the presently preferred embodiment, the conductive layer 110 comprises a 0.0254 mm thick aluminum alloy comprised of 99.51% aluminum, 0.35% silicon, 0.60% iron (as fume), 0.10% copper (as fume), 0.05% manganese (as fume), 0.05% magnesium, 0.01% chromium, 0.10% zinc (as fume), and 0.03% titanium. Such a layer can be obtained from the Consolidated Aluminum Corporation (Part Nos. 1050, 1100, 1145, 1200, 1235, 1250, 1270, 1285, and 1350) or the Alcan Aluminum Corp. (Part Nos. 1025 to 1500).

Aluminum alloy is used in the presently preferred embodiment for the following reasons. First, it has low cost. Second, it can be purchased in large sheets. For example, in a presently preferred method of manufacturing the present invention, these sheets have dimensions of twenty-eight inches wide by one thousand feet long. Third, it is flexible. Fourth, it is highly resistant to environmental conditions typically seen by electronic components. Fifth, it can be easily cut to specific sizes. Sixth, aluminum

alloy has performance characteristics that are well suited for this application. Specifically, a typical stray electromagnetic field that exceeds the specifications discussed below radiates when the circuit is operating above thirty MHz. The aluminum alloy used in the presently preferred embodiment is conductive to stray fields at frequencies above approximately thirty MHz. It is noted that other conductive materials may be used. The only limiting factor is that the first conductive layer must conduct electromagnetic fields.

In a presently preferred embodiment, the insulating layer 20 is actually comprised of three different layers 115, 120, 125. First insulating layer 115 is comprised of a semiconductor material. In a preferred embodiment, this semiconductor material is paraffin-based resin glue. This material is chosen because it is possible to align the molecules of the semiconductor material such that when it is exposed to an electromagnetic field, the charge of the dielectric will increase, which will increase the electrostatic potential of the electromagnetic radiation between the conductive plates 110, 130. The molecules of this material are aligned as follows: During the manufacturing process, the paraffin-based material is subjected to magnetic field while the material is in a semi-fluid state. When the material solidifies, the molecular structure tends to be aligned and corresponds to the previous polarized magnetic field. Second insulating layer 120 is comprised of a fibrous material. In presently preferred embodiments, this fibrous material can be sixty-pound paper, one hundred twenty-pound paper, or ten-point paperboard. Third insulating layer 125 is comprised of the same material as the first insulating layer 115.

It is important to note that the insulating layer 20 can be comprised of materials other than those described. The purpose of the insulating layer is to electrically isolate the first conductive layer 15 from the second conductive layer 25. Any material that is capable of doing this can be used for the insulating layer 20.

Below insulating layers 115, 120, 125 is second conductive layer 130. Second conductive layer 130 is preferably comprised of the same material as first conductive layer 110. Below the second conductive layer 130 is an outer layer 135. Outer layer 135 is preferably constructed with the same materials as outermost layer 105. Below outer layer 135 is an adhesive layer 140. Adhesive layer 140 is used to affix the shield 100 to the electronic component upon which the shield is mounted. Adhesive layer 140 is preferably comprised of model no. 966 adhesive available from the Minnesota Mining & Manufacturing Corporation. However, any adhesive that is not water-soluble, has high resistance to heat, and will maintain adhesion over the life of the product would provide satisfactory performance. Furthermore, the surface energy of the electronic component surface must be compatible with the adhesive characteristics of layer 140. A peel-away layer (not shown) covers the adhesive layer 140 until it is time to install the shield 100 on the electronic component. When it is desired to install the shield 100 of the component, the peel-away layer is removed from the adhesive layer 140 and discarded.

The method of manufacturing the presently preferred shield 100 will now be discussed. The shield is constructed using sheets of the materials that comprise layers 105, 110, 115, 120, 125, 130, 135, 140, which result in the manufacturing of strataform panels. The desired size of the strataform panels is determined and the individual sheets of the materials that form each layer are cut to the selected size. For example, as discussed, the various layers can be purchased in rolls of 1000 feet by 28 inches. These rolls are cut into press sheets depending on the nominal size of the shield. Press sheets could be eight and one-half by eleven inches, for instance, or ten by twelve inches, depending on how many shields can be extracted from each sheet. The layers are placed together, back-to-back, with the paraffin-based glue which will form the first insulating layer 115 and second insulating layer spread evenly over the interior portions of the aluminum alloy sheet forms. The sandwich is laminated using any typical laminating machine or laminating station. The purpose of the laminator is merely to combine the sheet material into a strataform panel containing multiple layers. It is noted that if outermost layer 105 and outer layer 135 do not comprise the polyester material discussed above, it can be applied by merely spraying the surface

of the outer portion of the sheet forms which will form the first conductive layer 110 and second conductive layer 130 with lacquer, resin or PTFE (such as Teflon.RTM. brand PTFE). The result of this process is that strataform panels are created.

An adhesive sheet is then placed on the side of the strataform panel opposite the printed surface of the outermost layer 105. This adhesive sheet has adhesive on both sides. One side attaches to the outer layer 135 while the other side is used when installing the shield 100 onto an electronic component. As discussed above, the finished shield product has a peel-away-layer on the adhesive that is removed at the time of installation. The final product with the polyester on one side and the adhesive on the other is in sheet form

After the strataform panels are created, artwork is printed onto the topmost layer 105. The artwork includes the actual shield outline and information that will remain on the shield surface (e.g., part number and manufacturer's name). In the presently preferred method, the artwork will be silk screened onto the surface. A laminate (not shown in the Figures) can be placed on the printed surface after the printing is completed. A typical laminate would be polyester film, measuring 0.001 in. This film virtually eliminates the possibility of the artwork being scratched. Although used primarily for cosmetics, such a laminate also contributes to the reduction of unwanted electromagnetic emissions. This is due to the dielectric properties of the polyester film. A laminator known to those skilled in the art is used to place this polyester film on the surface.

The sheet forms are cut into the actual shields 100 by using either a steel rule die or Class A die mounted in a clam shell press. Cutting of the shields 100 from the sheets is a critical step, as they must be cut in a fashion that will prevent the first conductive layer 110 from being in physical and electrical contact with second conductive layer 130. This is important because the first and second conductive layers 110, 130 interact with each other to either absorb or reflect the stray electromagnetic fields (as will be discussed below). If the first and second conductive layers 110, 130 were to contact each other, a short circuit would be created, which would prevent the shield 100 from working properly. In the presently preferred method of cutting the shields 100 from the sheet, a clam shell press is used. Such a press ensures that the first conductive layer 110 and the second conductive layer do not physically contact each other.

The shape of each shield 100 is important to its performance. Preferably, the shield will not have any corners. However, the shield can have any shape and provide satisfactory performance. It can be oval, rectangular, curvilinear and circular.

With reference to FIGS. 4-8, the manner in which shield 10 attenuates unwanted electromagnetic emissions will be discussed. Shield 10 actually induces several different mechanisms for collapsing the stray electromagnetic field created by an electronic device. It is noted that in FIGS. 4-8, the dielectric layer 20 is not shown, while the first conductive layer 15, the second conductive layer 25, and the electronic device 30 are shown separated from each other. This is done for illustrative purposes only and is not intended to limit the scope of the invention. The first and most basic of the mechanisms the present invention utilizes to attenuate the stray electromagnetic field emitted from electronic device 30 is shown in FIG. 4. When an electronic device 30 is emitting stray electromagnetic fields, many of the waves comprising the field are directed perpendicular to the package. The arrows in FIG. 4 represent the waves being emitted perpendicular to the electronic device 30. In the basic mechanism shown in FIG. 4, both the first conductive layer 15 and the second conductive layer 25 absorb some of the waves of the electromagnetic field emanating from the electronic device 30. Thus, each conductive layer 15, 25 attenuates the strength of the unwanted electromagnetic field.

The second mechanism of the invention for collapsing the stray electromagnetic field is shown in FIG.

5. As seen in FIG. 5, in addition to acting as a shield, both the first conductive layer 15 and second conductive layer 25 act as antennas and reflect some of the waves of the field back towards the source of the unwanted electromagnetic radiation. Thus, second conductive layer 25 reflects some of the waves of the field from electronic device 30 back towards electronic device 30. The electromagnetic field reflected by second conductive layer 25, through interference, cancels out some of the unwanted emissions. Likewise, first conductive layer 15 reflects some of the waves of the field that passed through second conductive layer 25 back towards insulating layer 20 (not shown in FIG. 6) and the second conductive layer 25.

The second conductive layer 25, the insulating layer 20 and the first conductive layer define a wave guide. This causes electromagnetic field to emit perpendicular to the original unwanted emissions. The field emitted perpendicular to the original unwanted emissions is seen by the arrows in FIG. 6. The reason for this is as follows. The two conductive planes of the shield allow electromagnetic energy to reflect between them. Plane transverse electromagnetic mode waves result in a higher order transverse electric mode. The transverse electric mode wave will not be transmitted unless the wavelength is sufficiently short. Their critical wavelength, at which the transmission is no longer possible, is called the cut off wavelength. The cut off wavelength as a function of sheet spacing is the wavelength of the electromagnetic waves between the first conductive layer 15 and second conductive layer 25 divided by four. However, the longest wavelength which can be transmitted between the sheets in a higher order mode (i.e., a higher order harmonic of the electromagnetic waves between the first conductive layer 15 and second conductive layer 25) is determined by Lambda=2 B, where B is equal to the distance between the two conducting planes. Because the two conducting planes create a resonating cavity, the energy from this resonance is directed to the edges, since there is more energy in the center of these two planes than there is on the edges. Furthermore, it is not just the parallel planes themselves that cause electromagnetic energy to emit from the sides of the shield 10, but also the dielectric sheet wave guide effect, whereby the transverse electromagnetic wave is launched into the sheet from reflections between the two conductive layers.

In addition to directing the waves of the field perpendicular to the original unwanted emissions, the waves of the field reflected off of the first conductive layer 15 reflect back and forth between the first conductive layer 15 and second conductive layer 25, i.e., the waves resonate. With the field resonating between the first conductive layer 15 and the second conductive layer 25, the magnitude of the electrostatic potential of the field that passes through the first conductive layer 15 and into the environment attenuates. This is because the waves of the field resonating between the first conductive layer 15 and the second conductive layer 25 interfere with, i.e., cancels, the waves of the stray electromagnetic field that emanate from the electronic device 30.

Electronic devices also emit a magnetic field that envelops the sides of the electronic devices. This is seen in FIG. 8. The shield 10 of the present invention also reduces this field. However, it is important to properly install the shield 10 onto a device because the shield 10 actually creates a field of its own. If the field created by the shield 10 becomes too great, it could adversely affect the operation of the electronic device upon which it is mounted.

The various methods in which the shields 10 of the present invention are installed will now be discussed. When a digital device such as a computer system is being tested on a FCC registered test site, the tests discussed above are performed. This test site has a receiving antenna that is connected via special cable to a spectrum analyzer. The digital device undergoing testing is placed in the center of a rotating table that is located three meters from the antenna. The rotating table is rotated by remote electronic control until the antenna receives the maximum amplitude of specific frequencies of the stray electromagnetic radiation that is generated by the equipment under test. This information is displayed on the spectrum analyzer. If the amplitudes received by the antenna exceed the FCC limit, the shields 10 of

the present invention are installed on specific electronic components (i.e., integrated circuits) of the equipment being tested. The test is then repeated to determine the effect that installing the shields 10 had on the unwanted emissions. If the amplitudes of the unwanted electromagnetic emissions continue to exceed the FCC limit, additional shields 10 may be installed to reduce the amplitudes to a value below the FCC limits.

To determine which electronic components to install the shields 10 of the present invention on, it must be determined where the unwanted stray electromagnetic emissions are being generated on the printed circuit assembly and how they are being distributed throughout the equipment. This is done by reviewing schematics, layout drawings and other technical references for the product undergoing testing. By doing this, the location where the excessive electromagnetic radiation is being produced can be located. Examples of "noisy" components that are likely sources for the unwanted emissions include multi-vibrators, crystal oscillators, collpits oscillators, and other oscillating components. Shields 10 of the present invention are then placed on all of the circuits closest to the likely source for the excessive emissions.

Another method of determining which specific electronic components should have the shields 10 of the present invention installed on is by the equipment's orientation. For example, the data cables that are connected to the input/output ports of the product undergoing testing may very well be located closer to the antenna at the time the maximum amplitude of the unwanted electromagnetic radiation is measured (as discussed, the product undergoing testing is mounted onto a turntable). To resolve this type of failure, the shields 10 of the present invention may be installed onto the electronic component used to interface with the input/output ports.

On the other hand, even if data cables are oriented such that they are facing the antenna, review of the schematics might show that the unwanted electromagnetic radiation is being generated by a microprocessor and/or associated circuitry on the printed circuit board driving the input/output port. In this situation, the microprocessor and associated interface circuitry will have a shield 10 of the present invention installed thereon.

The result of installing a shield 10 of the present invention onto a specific electronic component will be seen on the spectrum analyzer, as the reduction of the unwanted emission amplitude will be measured again by the calibrated antenna.

Typically, to access the electronic components PC boards of the product undergoing testing, a portion of the enclosure is removed. Typically, one or two shields 10 of the present invention are installed on electronic components in the vicinity of the determined sources of unwanted electromagnetic radiation. After the shields 10 are installed, portion of the enclosure which was removed is re-attached to the product. The RF energy would then be measured to see what the effect was. The reason that only one or two shields 10 are installed at a time is that installing too many shields 10 in a product may cause more unwanted emissions. Therefore, a step by step procedure must be used to ensure that the overall unwanted emissions of the device are reduced below acceptable limits

Another method of determining which electronic components to install the shields 10 of the present invention will now be discussed. The product undergoing testing is characterized on a calibrated radio frequency interference test site between thirty and two hundred Mz in both the horizontal and vertical polarization. This means that the receiving antenna connected to the spectrum analyzer will be positioned in the vertical (with respect to the ground surface) orientation for one set of data, and horizontal (with regards to the ground surface) for the other set of data. Failure data is characterized by unwanted emissions having specific amplitudes exceeding the limit.

The product undergoing testing is then removed from the test site. The cover of the product is removed, and a high-speed oscilloscope (at least a 150 MHz) is adjusted so that a specific offending frequency of unwanted emissions, such as 80 MHz, can be seen readily on the scope face. Using the appropriate probe attached to the high-speed oscilloscope, the areas of the printed circuit assemblies of the product undergoing test where the unwanted emissions (e.g., the 80 MHz signal) appear on the scope face are located.

The spectrum analyzer connected to the calibrated antenna is adjusted such that its resolution bandwidth set to 100 kHz, its video bandwidth is set to 100 kHz, its frequency span set to 0 Hz, and its center frequency set to 80 MHz (for this particular example). The appropriate probe is connected to the spectrum analyzer so that when that probe is brought adjacent to the oscilloscope probe cable , the amplitude of the unwanted emission can be seen on the spectrum analyzer scope face. The specific electronic components where the amplitude of the unwanted emission (in this case, the 80 MHz signal) is at its highest are then found by moving the oscilloscope probe around the interior of the product undergoing testing. The shields 10 of the present invention are then installed on those specific components. If the location of the shield 10 is suitable for the application, the spectrum analyzer will show a definite decrease in the amplitude of the unwanted emissions.

At this point, the cover of the product is reinstalled, and the product is retested in accordance with the above-described specifications. It is important to note that prior to installing the shields 10 in the product for the first time, only the fundamentals and associated harmonics of the unwanted emissions should be measured. If the product undergoing testing fails again, then it should be determined whether the unwanted emissions are fundamentals or harmonics. If they are fundamentals, use the same techniques described above and install the shields 10 of the present invention on top of the electronic components and associated conducting pathways (i.e., metal circuit traces) on the PC board to decrease the RF energy on the PC board. Any harmonics that still are exceeding the unwanted emission levels can be reduced by analyzing "divide by" circuits or equivalent circuitry and applying RF disks to the associated integrated circuits.

The level of attenuation of the stray electromagnetic field and the density of the field created by the shield 10 varies as function of the size of the shield 10. A larger shield will attenuate the stray field more than a smaller shield. However, a larger shield will create a greater field density than a smaller shield. Thus, when installing a shield on an electronic device, it may be necessary to use a shield of one size, determine the attenuation, and verify that the electronic device still operates properly. If these parameters are not met, this shield can be removed, and a new shield of a different size can be installed on the electronic device.

The field created by the shield 10 also varies as a function of materials used to construct the shield. As discussed, in the presently preferred embodiments, the first conductive layer 15 and second conductive layer 25 are constructed of aluminum alloy. The first conductive layer 15 and second conductive layer 25, however, can be constructed of magnetic materials, therefore causing the shield 10 to interact more readily with magnetic fields in an operating environment. It is noted, however, that the aluminum alloy used for the first conductive layer 15 and second conductive layer 25 of the preferred embodiment interacts primarily with electric and electrostatic fields.

In addition to preventing unwanted emissions of electromagnetic radiation, the apparatus of the present invention reduces an electronic device's susceptibility to external electromagnetic radiation. This is important because external electromagnetic radiation can disturb the operation of an electronic device. In addition, regulatory agencies such as those described above have either promulgated or are promulgating regulations regarding the susceptibility of electronic products to electromagnetic radiation. Examples of susceptibility regulations that have been promulgated by the European Community are

discussed above. The manner in which the various embodiments of the present invention operate to reduce an electronic device's susceptibility to external electromagnetic radiation will be discussed with reference to FIG. 9. As seen in FIG. 9, external electromagnetic radiation (shown in FIG. 9 as arrows) can strike the shield 10 at any angle The manner in which the shield 10 prevents this radiation from reaching the electronic device 30 is similar to the manner in which the shield 10 collapses the stray electromagnetic field emitted by the electronic device 30. First, the first conductive layer 15 and the second conductive layer 25 absorb some of the waves of the external electromagnetic field. Thus, each conductive layer 15, 25 attenuates the strength of the unwanted electromagnetic field. In addition to acting as a shield, both the first conductive layer 15 and second conductive layer 25 act as antennas and reflect some of the waves of the field back towards the source of the unwanted electromagnetic radiation, which is shown in FIG. 9. Thus, first conductive layer 15 reflects some of the waves of the field back towards the source of the field. This causes some of the electromagnetic field reflected by first conductive layer 15, through interference, to cancel out some of the external field.

Likewise, second conductive layer 25 reflects some of the waves of the field that passed through first conductive layer 15 back towards insulating layer 20 and the first conductive layer 15. As described above, the first conductive layer 15, the insulating layer 20 and the second conductive layer define a wave-guide. This causes an electromagnetic field to be emitted coplanar with the shield 10. For simplicity, this is not shown in FIG. 9. In addition, some of the waves of the electromagnetic field are reflected by the second conductive layer 25 back towards the first conductive layer 15. Some of these waves are then reflected back towards the second conductive layer 25, i.e., the waves resonate. Just as described above, when the waves of the field are resonating between the first conductive layer 15 and the second conductive layer 25, the magnitude of the electrostatic potential of the field that passes through the second conductive layer 25, and hence is communicated to the electronic device 30, is attenuated. This is because the waves of the field resonating between the first conductive layer 15 and the second conductive layer 25 interfere with, i.e., cancel, the waves of the external electromagnetic field. These mechanisms act to reduce the amount of electromagnetic radiation that reaches the electronic device 30.

FIG. 10 shows a printed circuit board 200 having various electronic components 210, 215, 220, 225, 230 installed thereon. When the product that utilizes this printed circuit board 200 is tested for stray electromagnetic emissions and fails, the emissions from each of the electronic components 210, 215, 220, 225, 230 can be measured using an antenna that communicates with a spectrum analyzer or other type of device, as discussed above. In addition, whereas a spectrum analyzer can reveal specific frequencies and specific magnitudes of the stray electromagnetic fields, it is possible to use a receiver that tunes to a specific frequency from which the magnitude can be derived. This allows testing of specific frequencies, should that be necessary. Shields 10 of the present invention can be installed on those components that are emitting excessive levels of electromagnetic radiation. According to most specifications (see above) most countries will not allow the shipment, sale or marketing of digital devices without first being tested to ensure that they have levels of electromagnetic radiation below 40 dB microvolts per meter at 30 MHz when measured at 3.0 meters. For example, for the printed circuit board 200 shown in FIG. 10, shields 10 where installed on electronic components 210, 215, 220, 225, but not on electronic component 230.

As in the case of printed circuit board 200, it may not be necessary to place a shield 10 on every electronic component that is emitting excessive amounts of electromagnetic radiation. It is only necessary to install shields 10 on enough components such that the emissions from the product fall within those allowed by the regulations of the country where the product will be sold. It is necessary, however, to carefully select which components the shields 10 will be installed on. The reason for this is as follows. As discussed, the shields 10 themselves produce electromagnetic fields of their own (generally in the same plane as the shields). These fields will interact with the fields created by the

shields 10 installed on the other electronic components. Indeed, the interaction of the fields created by the shields 10 that are installed on the electronic components may aid in collapsing the fields created by an electronic component that does not have a shield installed thereon. An example of this interaction is seen in FIG. 11, which shows the electromagnetic field created when shields 10 are installed on electronic components 210, 215, 220, 225. Furthermore, depending upon the application, it may be desirable to install a shield 10 on only the electronic devices that are emitting the most electromagnetic radiation.

Shields 10 like those described herein have been constructed and have attenuated the electromagnetic radiation emissions from an integrated circuit by anywhere from three to twenty dB microvolts in a frequency range of 30 to 1000 MHz.

Another embodiment of the present invention will be discussed with reference to FIGS. 13-14. The embodiment of the present invention shown in FIGS. 13-14 utilizes a shield 300 oriented in a curvilinear fashion. In the example of FIG. 13, a shield 300 of the present invention is installed in a curvilinear fashion on a printed circuit board card cage 305 to reduce unwanted electromagnetic radiation emissions emanating therefrom. Shield 300 is constructed as described above. Shield 300, however, is generally larger than the shields described above, in that shield 300 is designed to be installed over brackets and printed circuit boards, not a single electronic component.

As is seen in FIG. 13, the shield 300 is installed on card cage 305 such that it curves around card cage 305 at a substantially ninety-degree angle. Card cage 305 contains any number of printed circuit board assemblies 310, 315, and 320. It is noted that redundant printed circuit boards are not shown in FIG. 13. In general, the chassis of a card cage 305 is constructed from rigid metal or plastic of sufficient strength to hold the printed circuit boards 310, 315, 320 in place. For illustrative purposes, the shield 300 of the present invention is shown such that it is slightly removed from the surface of the card cage. In a normal application, however, the shield 300 is placed directly on the card cage surface. By installing a shield 300 of the present invention in such a curvilinear fashion, the unwanted electromagnetic radiation emissions are effectively moved from the front of the card cage to the side. In this example, the front of the card cage consists of vertical printed circuit boards seen readily in this view, perpendicular to a horizontal plane and perpendicular to the invention.

In the example shown in FIG. 14, a shield 300 is installed to reduce unwanted emissions on a cable connected to a printed circuit board. An example of a cable that can emit unacceptable amplitudes of unwanted emissions include a composite video cable that is connected to a personal computer. A typical personal computer contains a number of printed circuit boards, e.g., printed circuit boards 310, 315, 320 (see FIG. 13), that are fastened to the chassis with a retaining bracket (not shown in FIG. 13). These retaining brackets are used to stabilize the printed circuit boards and hold them in place. As is seen in FIG. 14, the metal bracket 335 traverses the entire length of the printed circuit board 325 that faces the exterior of the personal computer. In general, the bracket 335 is connected to the printed circuit board 325 in two places (these connections are not shown in order to simplify the drawing). Passing through the metal bracket, however, is the composite video port 330. The outside surface of the metal bracket 335 is usually in contact with the chassis guides (not shown) of the personal computer.

To reduce the unwanted emissions from the cable (not shown), a shield 300 constructed in accordance with the present invention is installed in a curvilinear fashion such that it covers the inside of the bracket 335 (i.e., the shield 300 is disposed between the printed circuit board 325 and bracket 335). The shield 300 then turns at a substantially ninety-degree angle such that it traverses a predetermined length of the side of the printed circuit board 325 which has the electronic components installed thereon. In various preferred embodiments, this predetermined length should be at least two inches. The port 330 passes through the shield 300. Thus, the shield 300 of the present invention must have an aperture (not shown)

disposed therein to allow the port to pass therethrough.

It is important to note that the shield 300 may or may not electrically conductively contact the metal bracket of the printed circuit board 325. Spectrum analyzer measurements are taken to determine the effectiveness of conductive contact with the retaining bracket. If measurements determine that conductive contact did provide satisfactory attenuation, the shield 300 can then be installed in a non-conductive manner. Furthermore, the shield 300 in FIG. 14 is normally in contact the electronic components mounted on the component side of the printed circuit board 325. It is noted that the retaining bracket 335 shown in FIG. 14 is shown removed from the printed circuit board 325 to allow viewing for clarification of the inventive concepts shown therein.

Thus, a preferred apparatus for attenuating stray electromagnetic radiation emitted by electronic devices, and the method manufacturing and using the apparatus has been described. While embodiments and applications of this invention have been shown and described, as would be apparent to those skilled in the art, many more embodiments and applications are possible without departing from the inventive concepts disclosed herein. The invention, therefore, is not to be restricted except in the spirit of the appended claims.

* * * * *

